**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

ANN DARLENE WELLS, as Representative of    )
the Estate of Donald L. Wells, Deceased,       )
                                        )       09 CV 1198
                Plaintiff         )
      v.                              )       Judge Matthew F. Kennelly
                                          )
CITY OF CHICAGO, et al.,             )       Magistrate Judge Martin C. Ashman
                                          )
                Defendants.     )

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO BIFURCATION OF MONELL CLAIMS AND DISCOVERY FROM INDIVIDUAL CLAIMS

Plaintiff, Ann Darlene Wells, as Representative of the Estate of Donald L. Wells, by and through her attorneys, Howard & Howard Attorneys PLLC and Reyes and Bonoma, Ltd., files this Memorandum in Opposition to Bifurcation of Plaintiff's *Monell* Claims and Discovery From Individual Claims, and in support thereof, states as follows:

### INTRODUCTION

Plaintiff's Decedent, Donald L. Wells, was involved in a tragic accident in the late afternoon on April 25, 2008, when the semi-truck he was driving collided with the CTA El station in the Chinatown section of Chicago. The accident resulted in two deaths and multiple injuries, including injuries suffered by Mr. Wells. The accident was a high profile media event and drew considerable attention from the authorities as well.

Following the accident, Mr. Wells was immediately escorted by police to Stroger Medical Center, where he was examined by a physician and received some medical testing, including a "DUI Kit". Throughout his entire stay in Stroger, Mr. Wells was in the presence and in the custody of Chicago Police Officers, who considered him a prisoner. The toxicological tests run on Mr. Wells by the hospital that night were negative for the presence of drugs and

alcohol. Following the initial examination and the completion of the DUI kit, Mr. Wells refused further medical treatment and was discharged from Stroger.

Mr. Wells was placed in handcuffs and transported to Area 1 for interrogation. Once the interrogation was complete, Mr. Wells was taken into the Second District lock-up. Mr. Wells arrived in the Second District lock-up a little after 4:30 a.m. on Saturday morning April 26, 2008. He remained in that lock-up in the custody of the Chicago Police Department for an additional 43 hours at which point he was rushed by ambulance to St. Bernard's Hospital.

When he arrived at St. Bernard's Hospital, Mr. Wells could not walk and was completely incoherent. He was diagnosed with acute renal failure and pneumonia. After a few days at St. Bernard's, he was transferred to Christ Hospital because he needed a higher standard of medical care. Mr. Wells remained hospitalized at Christ for approximately 6 weeks for issues related to his kidneys, lungs and heart. He remained in acute renal failure and was suffering multiple system shut down. Mr. Wells succumbed on June 13, 2008. He died never having left medical care following his release from Chicago Police custody.

Subsequent investigation revealed that Mr. Wells' physical and mental condition had started to rapidly deteriorate during his time in police custody. Specifically, while at the Second District, Mr. Wells was visibly incoherent, speaking in an unusually slow manner and incapable of responding to basic questions. Mr. Wells was unable to control his bowel and bladder, and urinated and defecated on himself in his cell. Attorneys who visited Mr. Wells in the Second District lock-up on the morning following the accident indicated that Mr. Wells did not appear to know where he was and, at times, and could only grunt in response to questions, including those directed at Mr. Wells regarding his physical and mental condition.

2

The investigation also revealed that, despite this obvious and rapid deterioration, Mr. Wells was never given medical attention and was never taken to a hospital. Following visits by his attorneys, two different officers were informed by one of those attorneys about Mr. Wells' need for immediate medical attention. Mr. Wells' wife, Ann Darlene Wells, also called numerous times from their residence in Michigan and asked Chicago police officers to provide her husband with medication and medical care. Despite these requests, Mr. Wells never received any medical attention and was not taken to a hospital until having spent 53 hours in police custody, the last 36 of which occurred after police officers were told by Mr. Wells' attorney of his condition and need for medical attention. As Mr. Wells would have survived had he received timely medical attention, his death was a direct result of the deliberate failure of the Chicago Police Department to provide basic medical treatment while he was in their custody.

Plaintiff filed a Second Amended Complaint ("Complaint") against the City of Chicago (the "City") and individual employees/servants/agents of the City of Chicago ("Individual Defendants") alleging violations of constitutional rights pursuant to 42 U.S.C. §1983 and ancillary state law claims. Plaintiff's Complaint against the Individual Defendants arises out of their deliberate indifference to Mr. Wells' condition and their deliberate failure to provide him with basic medical care, which resulted in his death. Plaintiff's Complaint against the City seeks municipal liability based upon the policies and procedures that enabled and encouraged the practices that led to Mr. Wells' death. This Court has requested that Plaintiff file a brief showing cause why Plaintiff's claims against the Individual Defendants ("Individual Claims") should not be bifurcated or severed from her *Monell* claims. For the following reasons, Plaintiff's Complaint should not be bifurcated and discovery and trial should proceed simultaneously on all claims.

3

## STANDARD

"Pursuant to Rule 42(b), 'for convenience, to avoid prejudice, or to expedite and economize, the court may order a separate trial of one or more separate issues, claims, crossclaims, counterclaims or third-party claims." Bell v. City of Chicago, No. 09 C 4537, 2010 WL 432310 at *1 (N.D.Ill. Feb. 3, 2010). Although in this circumstance the party opposing bifurcation is submitting the moving brief, it is actually the party moving for bifurcation under Rule 42(b) that bears the burden of proving that separate trials are justified. Caterpillar, Inc. v. Deere & Co., No. 96-5355,1997 WL 17798 at *1 (N.D.Ill. Jan. 14, 1997). To date, Defendant City has not moved for bifurcation and there is absolutely no justifiable reason to sever Plaintiff's *Monell* claims from here individual claims against Defendant officers.

## ARGUMENT

### A. Bifurcation of the Monell claim will result in, rather than avoid, prejudice to one of the parties.

Bifurcating Plaintiff's individual claims from her *Monell* claims will cause irreparable prejudice against Plaintiff, while Defendants will not be prejudiced if the *Monell* claims are tried simultaneously. Plaintiff will be prejudiced for three reasons. First, it will unnecessarily delay, and perhaps effectively deny in its entirety, Plaintiff's ability to litigate her *Monell* claims. Second, bifurcation will result in the unnecessary duplication of discovery and trial, which will drain Plaintiff's financial resources without any tangible benefit, as two full trials involving expert witnesses will have to be conducted. Third, the Plaintiff will be prejudiced in presenting her claims against both the Individual Defendants and the City, since the claims and evidence regarding the City's policies and practices, the Individual Defendants' adherence or disregard of those policies, and the pattern of similar prior behavior are all interrelated and relevant to Plaintiff's *Monell* and Individual Claims.

4

Defendant City, however, will not be prejudiced by trying the *Monell* claims with those of the individual officers. As established through the discovery process, there does not seem to be any realistic possibility of undue prejudice to either the Defendant officers of the City itself. If anything, Defendants are seemingly weaving a unified theory that there is no liability on behalf of any individual defendant or the City based on the actions and condition of Mr. Wells both before and after the accident. Furthermore, as many of the *Monell* witnesses have already been deposed in other cases and Plaintiff will limit its presentation of evidence on this claim to a smaller number of instances than those disclosed in her Rule 26(a)(1) Supplemental Disclosures. Finally, it is hard to imagine any credible claim of prejudice by the City where it has not made a timely motion for bifurcation, despite the fact that it does so routinely in other similar cases.

1. **Plaintiff will be irreparably prejudiced by conducting a separate trial and discovery on her *Monell* claim.**

"A plaintiff has the right to select the claims she wishes to pursue, so long as those claims state legally viable cause of action and raise live fact issues for trial." Cadiz v. Kruger, No. 06 C 5463, 2007 WL 4293976, at *6 (N.D.Ill. Nov. 29, 2007). "By being prepared to litigate the *Monell* claim vigorously (including by expending the resources to retain experts on the *Monell* claim), plaintiff has signaled that she believes the *Monell* claim is important to her case. If some delay in the commencement of trial were to result from the presence of a *Monell* claim, that is a detriment that plaintiff is apparently prepared to endure in order to have the chance to prove her *Monell* claim. Thus, while in some cases there may be good and compelling reasons for bifurcating *Monell* and *non-Monell* claims, protecting the interests of a plaintiff who wishes to simultaneously pursue both is not one of them." Id.

By separating Plaintiff's claims and trying the Individual Defendants first, Plaintiff's opportunity to try her *Monell* claims on the merits and impose liability directly upon the City for

its wrongdoing is significantly and unnecessarily delayed. The burden on Plaintiff in litigating a *Monell* claim is arguably greater than the burden on the City. However, Plaintiff has chosen to litigate all of her claims simultaneously and has already made a considerable financial investment, devoting hundreds of hours to developing and investigating facts to support her *Monell* claim against the City. In addition, witnesses relevant to *Monell* have already been deposed, and transcripts or affidavits tendered to the City. Plaintiff's efforts have been assiduous despite the City's slothful cooperation. Bifurcating the *Monell* claims from the individual claims will disregard Plaintiff's efforts and her choice to litigate this case as a whole, and needlessly delay Plaintiff's opportunity to prove these claims at trial.

On a substantive level, this case concerns a collective omission to act on the part of a number of City employees. Therefore, Plaintiff is not prepared to concede that there is no municipal liability without individual liability. Plaintiff alleges that the City is an *offending party*, not merely an indemnifying one. Since none of the city's employees acted to provide Mr. Wells with medical attention, perhaps they ignored policy and procedure training they received, and could be individually liable; or perhaps there is a void in policy and procedure that allowed Mr. Wells to "fall through the cracks" of the process and not receive medical attention when he should have. Therefore, it is possible that the municipality could be liable without an individual defendant appended. This militates strongly against bifurcation.

In Plaintiff's case, the Individual Defendants claim, *inter alia*, ignorance of Mr. Wells' failing medical condition. Mr. Wells' hospital release papers from Stroger were disregarded and, although his arrest report indicated that he had obvious injuries, the City's employees took no additional steps to ensure his safety in their lockup. This is indicative of a pattern and practice pervasive throughout the City's lockups. Therefore, the pivotal question here is whether there is

6

a direct causal like between the municipal policy or custom and Mr. Wells' constitutional deprivation. <u>City of Canton v. Harris</u>, 489 U.S. 378 (1989). When the local government's failure to train or discipline its police officers constitutes deliberate indifference to the rights of persons with whom the police come into contact and causes a deprivation of a person's constitutional rights, the local government is liable to that person for his injuries. <u>Id</u>. at 388-389.

Importantly, Plaintiff will introduce the policies and procedures that form the heart of the *Monell* claim as evidence in the case against the individual officers. As such, bifurcation would not result in any benefit. This evidence is admissible and relevant, as the City's policies and procedures are a cause of the deliberate indifference manifested by the officers. In part, the City's *de facto* policies and practices contributed to Mr. Wells' death by fostering an environment where no discipline is imposed for the violation of these policies, thus encouraging future misconduct by police officers. These policies and procedures are also extremely relevant if they demonstrate that the Individual Defendants received specific training, but chose to ignore such training, thus manifesting a deliberate indifference. In a similar vein, the Individual Defendants' understanding and compliance with the policies and procedures would be relevant to whether there was deliberate indifference.

**2. <u>Defendants will not be prejudiced if the Monell claims are tried simultaneously.</u>**

To date, the Individual Defendants have not asserted any risk of prejudice to them by litigating the *Monell* claims against the City simultaneously with the claims against them. Additionally, it would be difficult for any party to allege, at this time, that a risk of prejudice exists, since discovery on the *Monell* claims is incomplete.

The Court has extended *Monell* discovery through August 9, 2010. Although the City

did not begin cooperating with Plaintiff's *Monell* request until February, 2010, Plaintiff, through her diligent efforts, has reviewed hundreds of documents and complaints and secured cooperation from many Plaintiffs and/or their attorneys and already tendered the fruits of her labor to the City. Plaintiff has located a multitude of cases demonstrating the City's practice and policy where (a) arrestees and/or detainees are not provided with medical care while in police custody; and (b) detainees are impermissibly and illegally held up to and over forty-eight (48) hours for the sole purpose of launching an investigation in order to obtain felony charges against the arrestees. While Plaintiff embraces each case already identified on both issues, Plaintiff is willing to significantly reduce the number of cases chosen in order to accommodate the Court's schedule and objectives and avoid a prolonged trial. In most of these complaints, Plaintiff has already tendered discovery to the City.

**B. Separation of Plaintiff's *Monell* claim will not make trial or discovery more convenient for the parties, third party witnesses, or this Court.**

Any argument for convenience in favor of bifurcation rests on the assumption that only one trial will be required to adjudicate all of the issues in this case. Bifurcating the Individual Claims from the *Monell* claims presents the risk of a second trial and the resulting time, effort and inconvenience to parties, third parties, and the Court. A second trial on Plaintiff's *Monell* claim will require that many of, if not *all*, of the same witnesses from the first trial be called in to testify again. Plaintiff's claims against the City involve allegations of policies, customs and practices that were followed by the Individual Defendants and led to the deteriorating health and resulting death of Mr. Wells. Testimony concerning the Individual Defendants' actions is also relevant to *Monell* claims where it evidences adherence to a City policy or procedure. As such, the Individual Defendants will suffer the inconvenience of preparing for and testifying twice, and doing so on many of the same facts for the second trial as the first. Third party witnesses will

also be inconvenienced by a second trial, particularly where their participation in the first trial may have already covered the exact same facts. Those inconvenienced would include a number of doctors and expert witnesses. Thus, many of both plaintiff's and defendants' witnesses, as well as the parties themselves, will be unnecessarily burdened with time, energy and financial expenditures if they have to prepare and testify at two trials based on the same facts.

On the contrary, both Plaintiff and Defendants will benefit from the convenience of conducting discovery and trial of both individual claims and *Monell* claims simultaneously. Since discovery on the *Monell* claims has been in progress for months, proceeding to trial on both the *Monell* and individual claims comports with practicality and judicial economy. Many witnesses and defendants in this case have already testified to their training or lack thereof, and the policy and customs of the City to which they either adhered or failed to adhere. Should a second trial be necessary, practically all of these same witnesses would be once again required to appear and testify before a jury.

## C. **Bifurcation of Plaintiff's claims will not promote judicial economy.**

Bifurcation will not promote the policies of judicial economy unless the sole reason for bifurcating the *Monell* claim is to effectively eliminate it and preclude the litigation of this claim. Here, an examination of the facts and circumstances of this case demonstrates that the bifurcation of the *Monell* claim would result in more work for each party, the witnesses, any jurors, as well as for the Court itself. The Court undoubtedly has two concerns: judicial economy in the discovery stage and judicial economy with respect to any trial(s).

Initially, Plaintiff would inform the Court that she is willing to reduce the number of *Monell* witnesses identified in her amended 26(a)(1) Disclosures. Although there may not be a magic number, Plaintiff is willing to limit both the number of incidents and the number of

witnesses for each incident in an effort to promote a single trial and to promote judicial economy. It was never the intent of the Plaintiff to present evidence on all of the incidents listed or call all of the witnesses listed for each incident. Rather it was to provide the City with as much information regarding the possible witnesses that may be called.

There will be little to no benefit gained in the discovery stage as a result of bifurcation. Discovery for Plaintiff's claims against the Individual Defendants will necessarily overlap with discovery that may also be useful in her *Monell* claim. Bifurcation of Plaintiff's *Monell* claim from the Individual Claims will cause unnecessary and wasteful disputes concerning whether the discovery sought is relevant to the non-*Monell* claims or if it should be limited in scope. For example, an Individual Defendant's training regarding identification and treatment of illness in a detainee is relevant to the non-*Monell* claims against that individual, because failure to adhere to that training may shed light on that individual's attention to or indifference to the illness before him. Furthermore, that individual's past experience with identifying and responding to the medical needs of a detainee is relevant when compared to how the individual identified and responded to Mr. Wells' medical needs. Both of these discovery subjects are relevant to the Individual Claims, and both could be needlessly challenged because they may also be relevant to Plaintiff's *Monell* claims.

Another reason judicial economy will not be substantially advanced in the discovery stage by bifurcation is that the bulk of discovery has already been completed. Counsel for Plaintiff has poured over two thousand CRs, interviewed countless complainants, and whittled the number down substantially. Counsel for Plaintiff has already followed this same course with complaints filed in state and federal court. Many of these witnesses to the other incidents have been deposed in other cases or already had statements reduced to writing. In this case, where

substantial discovery has already been conducted on the *Monell* claims, there is a substantially reduced benefit to be gained from bifurcation.

The interests of judicial economy as it relates to the actual trial(s) will certainly not be advanced by bifurcation, and will, in fact, be hindered by such a course of action. The interests of judicial economy will never be promoted where there is a strong likelihood that there will be multiple trials, instead of one. Inherently, bifurcation presents the risk that a second trial may be necessary to fully resolve all of Plaintiff's claims. If discovery is stayed and the *Monell* claim bifurcated, "the *Monell* claim would not be ready for trial…at the time the individual claims go to trial. As a result, if plaintiff were to prevail on one or more of those claims at trial, then the trial of the *Monell* claim could not commence before the same jury. Rather, we would have to restart the discovery process; subject certain witnesses who already were deposed on the individual claims to an additional deposition on the *Monell* claim; go through summary judgments on the *Monell* claim; and then, if the *Monell* claim goes to trial, empanel an entirely new jury to hear it." Cadiz at *7.

The necessity of a second trial is made further relevant to the issue of bifurcation by the Seventh Circuit's recent decision in Thomas v. Cook County Sheriff's Department, 603 F.3d 293 (7th Cir. 2010), which narrowed the Supreme Court's decision in Los Angeles v. Heller, 475 U.S. 796 (1986). In Heller, the Supreme Court held that a municipality could not be held liable for constitutional violations based on the actions of its officers if the jury found that the officers did not violate the plaintiff's constitutional rights. Id. at 799. This was the law in the Northern District for the past 24 years and many decisions to bifurcate *Monell* claims were justified by the ruling in Heller.

Recently, however, the Seventh Circuit narrowed the ruling in <u>Heller</u> to find that "a municipality can be held liable under *Monell*, even when its officers are not, unless such a finding would create an *inconsistent* verdict." <u>Thomas</u> at 305. Emphasis in original. To determine whether a municipality's liability is dependant on the actions of its officers, the Court looks at the nature of the constitutional violation, the theory of municipal liability, and the defenses set forth. <u>Id</u>.

Here, the Individual Defendants and the City have developed a theory through discovery that focuses on the actions and health of Mr. Wells that would completely absolve both the individuals and the City from liability if they are successful. Plaintiff should not be forced to run this same gauntlet twice, particularly where a large part of this theory involves medical testimony and experts who would have to be subjected to multiple trials. This would unnecessarily increase the costs to both parties and would lengthen the total time of the trial by requiring the completely duplicative and unnecessary action of readmitting days worth of testimony and making the same arguments to two different juries.

If anything, such a course could result in inconsistent verdicts for the Plaintiff, one that could not be avoided through the use of any interrogatories. The first jury could conclude that the Individual Defendants' actions in detaining Mr. Wells and denying him medical attention led to his death, but that their conduct was protected by qualified immunity as it did not rise to the level of deliberate indifference on part of the individual officers. In such an instance, Plaintiff may still have a viable claim against the municipality if he can prove a constitutional deprivation caused by a municipal policy or custom. <u>Medina</u> at 897. At that next trial on the *Monell* claim, however, the City would not be precluded from advancing the same causation type issues, thereby taking advantage of a second bite at the apple. In this situation, bifurcation will not avoid

a second trial, and that second trial (of the *Monell* claim) would be completely duplicative and invite inconsistent verdicts to the detriment of the Plaintiff.

**D. Public policy supports trying Plaintiff's claims simultaneously**

Certain public policy concerns also militate against entering an order bifurcating the *Monell* claim. Bifurcation of Plaintiff's *Monell* claim will effectively foreclose a true examination of the policies and practices of the municipality, as such an order would likely end the pursuit of the *Monell* claim. Although there is a certain deterrence factor that may be advanced by claims against specific officers, there are additional policy concerns that favor allowing an action to proceed against a municipality, which would be foreclosed if an order of bifurcation was entered. After all, the *Monell* claim is the only one that directly attacks or challenges the established policies and procedures of the City itself. By effectively eliminating the *Monell* claim via bifurcation, the City will undoubtedly be permitted to continue its tried and true course of action of addressing each incident as the product or failing of the individual officers involved, rather than examining its own established policies and procedures that form the core of the problem.

As such, the City, or its constituents, will never be forced to directly confront the policies and procedures that are causing injuries to a number of individuals. Moreover, considering that each policy and procedure is one that will theoretically be implemented by 20,000 officers and against all of the citizens of the municipality, public policy would strongly favor allowing, if not promoting, a challenge to the City's policies and procedures. In this way, a change in a defective policy or procedure may be facilitated, rather than a monetary band-aid being placed on a specific instance in hindsight by a myopic City. The City may only then be forced to change its policy or procedure, thereby preventing the death of another detainee for lack of basic medical

treatment. A finding against an officer cannot serve this purpose, or at the least not serve it as effectively, as a judgment entered against the City based on a condemnation of its own policies and procedures. Medina v. City of Chicago, 100 F.Supp.2d. 893, 897 (2000). (*"Perhaps even more important to society, however, is the ability to hold a municipality accountable where official policy or custom has resulted in the deprivation of constitutional rights.*). As the Seventh Circuit has recognized, "[a] judgment against a municipality not only holds that entity responsible for its actions and inactions, but also can encourage the municipality to reform the patterns and practices that led to constitutional violations, as well as alert the municipality and the citizenry to the issue." Amato v City of Saratoga Springs, 170 F.3rd 311, 317-18 (2nd Cir. 1999); *see also*, Medina at 897.

There is one additional public policy concern that must be raised in this matter and it is one of basic judicial fairness. Plaintiff has proceeded with her *Monell* claim for almost two years. Plaintiff has spent tens of thousands of dollars in costs and investigators fees in developing the *Monell* claim. Plaintiff has further spent hundreds of attorney hours pouring over complaints and CRs of individuals who were similarly situated to Mr. Wells. There was never a motion to bifurcate. Now, after thousands of possibly wasted dollars and wasted hours, the issue of bifurcation is raised. Although this Court certainly has the authority to raise the issue and implement the bifurcation sua sponte, such a result is not consistent with basic principles of fundamental fairness.

This unfairness is even more egregious considering that the main argument against bifurcation is that the City's policies and procedures have resulted in so many similarly situated individuals that have been injured that it makes presentation of a *Monell* claim cumbersome. Ironically, the worse the effect or wider the scope of the City's improper policies and practices,

the more likely it will be successful in foreclosing the only claim that could challenge it by bifurcation, effectively eliminating it. This should not be done, particularly where the policies being deterred by allowing the *Monell* claim to be litigated are the failure to provide medical treatment and the detention of individuals solely for the purpose of conducting and completing a criminal investigation that could possibly result in felony charges. Plaintiff is pursuing a judgment not only against the individuals that ignored her husband's obvious medical needs and detained him for the sole purpose of building a felony charge against him that never led to fruition, but also the entity that promoted policies and tolerated conduct that encouraged those individuals to act as they did.

## CONCLUSION

WHEREFORE, Plaintiff, Ann Darlene Wells, as Representative of the Estate of Donald L. Wells, respectfully requests that this Honorable Court enter an order against bifurcating or severing Plaintiff's *Monell* claims from her claims against the Individual Defendants.

Respectfully submitted,
ANN DARLENE WELLS,

By: __*/s/ Robert Robertson*__          By: __*/s/ Donna Rizzuto*__

REYES & BONOMA, LTD.          HOWARD AND HOWARD ATTORNEYS PLLC
Attorney for Plaintiff          Attorney for Plaintiff
1 N. LaSalle, Suite 4000          200 S. Michigan, Suite 1100
Chicago, Illinois 60602          Chicago, Illinois 60604
312.332.0055          312.372.4000
ARDC# 6204573          ARDC # 6227102

15