## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| **ANN DARLENE WELLS, as representative** ) | |
| **of the estate of Donald L. Wells, deceased,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| vs. ) | **Case No. 09 C 1198** |
| ) | |
| **CITY OF CHICAGO, et al.,** ) | |
| ) | |
| **Defendants.** ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Ann Darlene Wells, as representative of the estate of Donald L. Wells, has sued

the City of Chicago and twenty-five Chicago police officers and employees for claims

arising from his arrest, confinement, and death.  Plaintiff asserts claims under 42 U.S.C.

§ 1983 for unreasonable denial of medical attention, deliberate indifference to medical

needs, and unlawful detention, as well as supplemental state law claims for wrongful

death, survival, willful and wanton conduct, and indemnification.  Plaintiff has moved for

summary judgment on the unlawful detention claims.  The City has moved for summary

judgment on the unlawful detention and denial of medical care claims against it.  For the

reasons stated below, the Court denies plaintiff's motion and grants the City's motion in

part and denies it in part.

## Background

On April 25, 2008, Donald Wells (Wells), a resident of Michigan, drove his semi-

trailer truck through a bus stop and into a Chicago Transit Authority "L" Station.  Two

women were killed and twenty people were injured. Firefighters removed Wells from the cab of his truck, and paramedics transported him to a hospital.

At the hospital, Chicago police officer Joann Butkus and her partner Rachel Golubiak were waiting for Wells when he arrived in an ambulance at 6:05 p.m. Butkus followed Wells into the emergency room and was never more than about fifteen feet from him while he was at the hospital. The parties dispute some of the events that occurred at the hospital and whether police took Wells from the hospital and subsequently returned him there, but it is undisputed that at 10:40 p.m., police took Wells from the hospital to an interview room at a police station. After some time in the interview room, police placed Wells in a cell at the station.

Wells remained at the police station until April 27. During this time, police investigated the collision and considered whether to charge Wells with a felony such as aggravated reckless driving or reckless homicide. Wells was never taken before a judge for a probable cause hearing. Ultimately he only received a traffic citation, though police kept investigating the collision until the time of his death.

Police captain John Farrell testified that he arrived at the station for work at 9:00 p.m. on April 27 and told Wells that a decision on his release would be made shortly. Farrell then learned that Wells would not be charged with a felony. Farrell testified that before 9:30 p.m., he went to Wells's cell and told him that he was being released. Farrell noticed that Wells had removed all his clothes and became concerned that Wells might need medical attention and had nowhere to go once released. Farrell left Wells in the cell and went looking for the telephone number of one of Wells's family members. When he returned to the cell, Farrell found that Wells had again removed his clothes

2

and saw signs that Wells had been urinating and defecating on himself. Farrell decided

to send Wells to a hospital for evaluation. He initially called for a police vehicle, but

after finding that Wells had difficulty walking once released from his cell, Farrell instead

called an ambulance. Wells' arrest record states that he was released from custody at

10:15 p.m. The ambulance arrived and took Wells from the police station at 10:56 p.m.

Wells remained hospitalized for six weeks, suffering from pneumonia, renal

failure, and failure of multiple organs, and was never discharged before his death.

## Discussion

On a motion for summary judgment, the Court "view[s] the record in the light

most favorable to the non-moving party and draw[s] all reasonable inferences in that

party's favor." *Trinity Homes LLC v. Ohio Cas. Ins. Co.*, 629 F.3d 653, 656 (7th Cir.

2010). Summary judgment is appropriate "if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a). In other words, a court may grant summary judgment

"[w]here the record taken as a whole could not lead a rational trier of fact to find for the

non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574,

587 (1986).

Plaintiff has moved for summary judgment on the unlawful detention claims

against Chicago police officers and detectives Michael Deneen, Maureen McMahon,

John Farrell, Tracey Sanders, Rachel Golubiak, Joann Butkus, Elliott Musial, Galo

Gutierrez, Ronald Behling, and Arthur Block, and against the City. The City has moved

for summary judgment in its favor on the unlawful detention and failure to provide

medical care claims. The City also argues as part of its motion for summary judgment

3

that the Court should bar plaintiff's expert Dennis Waller. The other defendants have

not moved for summary judgment.

## A.     Unlawful detention claim against the individual defendants

A person arrested without a warrant is entitled under the Fourth Amendment to "a

prompt judicial determination of probable cause." *County of Riverside v. McLaughlin*,

500 U.S. 44, 47 (1991). It is generally sufficient if the government provides a probable

cause hearing within forty-eight hours of arrest. If the arrested person is held less than

forty-eight hours without a judicial probable cause determination, to establish a

constitutional violation he must show that the hearing "was delayed unreasonably." *Id.*

at 56. By contrast, if police hold an individual more than forty-eight hours without

providing a probable cause hearing, the government has the burden of "demonstrat[ing]

the existence of a bona fide emergency or other extraordinary circumstance" to show

that the individual's Fourth Amendment rights were not violated. *Id.* at 57.

### 1.     Length of Wells's detention

Plaintiff argues that Wells was arrested and held for more than forty-eight hours

without being brought before a judge for a probable cause hearing. She asserts that

Wells was arrested at 6:05 p.m. on April 25 when he arrived at the hospital and was not

released from custody until 10:56 p.m. on April 27 when paramedics took him from the

police station to the hospital. Defendants argue that Wells was arrested at 10:20 p.m.

on April 25, when investigator Elliott Musial told Wells that he was under arrest and

went over his *Miranda* rights with him, and that Wells was released before 9:30 p.m. on

April 27.

"An arrest requires either physical force . . . or . . . submission to the assertion of

4

authority." *California v. Hodari D.*, 499 U.S. 621, 626 (1991) (emphasis omitted). Police

are considered to have made a "show of authority" to which a person can submit "'only

if, in view of all the circumstances surrounding the incident, a reasonable person would

have believed that he was not free to leave.'" *Id.* at 627–28 (quoting *United States v.*

*Mendenhall*, 446 U.S. 544, 554 (1980)) (internal quotation marks omitted). "Examples

of circumstances that might indicate a seizure, even where the person did not attempt to

leave, would be the threatening presence of several officers, the display of a weapon by

an officer, some physical touching of the person of the citizen, or the use of language or

tone of voice indicating that compliance with the officer's request might be compelled."

*Mendenhall*, 446 U.S. at 554.

Plaintiff argues that police arrested Wells at the time he arrived at the hospital

because Butkus was waiting for him there and intended to place him under arrest.

Butkus's subjective intent, however, "is irrelevant except insofar as [it] may have been

conveyed to" Wells. *Id.* at 554 n.6. Defendants have presented evidence from which a

reasonable jury could find that a reasonable person in Wells's situation would have

believed he was free to leave. In her deposition, Butkus testified that she never placed

Wells in handcuffs and that he was not handcuffed until he was transported to the police

station at about 10:40 p.m. Pl. Ex. 2 at 39, 50. Butkus and Golubiak also told Wells

that he should stay in the hospital and receive whatever treatment doctors thought he

needed. *Id.* at 40. Butkus testified that she stayed near Wells the entire time he was in

the hospital but that she did not interview him at times when medical staff were treating

him and that the doctors' and nurses' questions to Wells took priority. Pl. Ex. 3 at

38–40. She also stated that after Wells was taken for a CT scan, she only had limited

5

conversations with him and did not ask him any more questions about the collision.
Indiv. Defs. Resp., Ex. A at 82. Butkus asked Wells his name and address and whether
he had a driver's license, but he did not respond. Pl. Ex. 3 at 39–40. Butkus testified
that she never told Wells that police were going to take him to the police station once he
was released from the hospital. Indiv. Defs. Resp., Ex. A at 80–81. Butkus also
testified that she was not always close to Wells at the hospital. She did not see hospital
personnel draw his blood or perform other tests because she stood outside the curtain
around his bed. Pl. Ex. 3 at 67, 91. She stated that at times she was sitting near a
nurses' station about ten feet away from Wells's bed. *Id.* at 75–76.

Given Butkus's testimony, a reasonable jury could conclude that Wells was not
under arrest while he was being treated at the hospital. Although there were often
several police officers around him and police asked him questions, a reasonable jury
could find that the police emphasized that Wells's medical treatment was a priority, he
felt free to refuse to talk to them, and they maintained their distance while the medical
staff worked.

Plaintiff also argues that Wells must have been arrested before 10:20 p.m.
because he was led out of the hospital in handcuffs more than an hour before that. To
support this, plaintiff offers footage from a television news broadcast on the night of the
collision. The footage shows a man with a blurred-out face, identified as the driver of
the truck involved in the collision, being led into a police vehicle and wearing handcuffs.
Pl. Reply, Ex. 12 at 17:13–17:40. The news report bears a time stamp of 10:01, and the
reporter states that the man was taken from the hospital "about an hour ago." *Id.*
Plaintiff also presents medical records indicating that Wells initially signed out from the

6

hospital against the medical advice of his doctor around 7:30 p.m. and returned around 10:30 p.m. so that doctors could obtain blood and urine samples for a DUI kit. *Id.*, Ex. 8 at 1, 3. Plaintiff argues that police arrested Wells and took him from the hospital, returned him to the hospital for the DUI kit and then took him from the hospital to the police station at 10:40 p.m.

Even with plaintiff's video evidence, however, there is a genuine factual dispute regarding whether Wells was arrested before 10:20 p.m. As noted above, Butkus testified that Wells was never placed in handcuffs until police prepared to transport him to the station around 10:40 p.m. She also testified that even if Wells had signed out when he refused additional medical treatment, he never left the hospital. Pl. Ex. 2 at 51–52. Additionally, sergeant Ronald Behling talked to Butkus around 9:00 or 9:30 p.m. Pl. Reply, Ex. 9 at 28, 68. He testified that he believed that at the time, Wells either was not in the hospital or was leaving the hospital, but that he also thought that Wells was being transported to another hospital. *Id.* at 28, 71–72. A reasonable jury could use Behling's testimony to find that even if Wells had been taken from the hospital earlier than 10:40 p.m., it was for additional treatment or some purpose other than taking him to the police station for interrogation and that he was therefore not under arrest.

There is also a genuine factual dispute regarding the time that Wells was released from custody. A fire department record indicates that an ambulance was dispatched for Wells at 10:35 p.m. on April 27 and that it took Wells from the police station at 10:56 p.m. Pl. Ex. 1 at 3. An arrest report showed that Wells had been released at 10:15 p.m., and a report by investigator Galo Gutierrez stated that he and another investigator, Michael Deneen, arrived at the police station at 10:15 p.m. so that

7

Wells could be released.

Captain John Farrell, however, gave testimony that would allow a reasonable jury to find that Wells was released earlier.  Farrell stated that he learned that there would be no felony charges against Wells shortly after his arrival at the police station at 9 p.m. Indiv. Defs. Resp., Ex. C at 327–28.  Before 9:30 p.m., Farrell said, he went back to talk with Wells to find out if there was anyone that the police could call for him or if they could drop him off somewhere.  *Id.* at 328–39, 331.  Wells was naked, and Farrell told him to get dressed because he was being released.  *Id.* at 332–33.  Wells did not provide Farrell with the name of anyone whom Farrell could call, and he was slow to get dressed.  *Id.* at 335–38.  After five minutes, Farrell left Wells in his cell and went to look through Wells's paperwork to see if he could find a phone number to call.  *Id.* at 342.  A few minutes later, when it was still about 9:30 p.m., Farrell returned to Wells's cell and found that Wells had again taken his clothes off.  *Id.* at 347–48.  At his deposition, Farrell did not remember any other prisoner who had ever been in less of a hurry to leave.  *Id.* at 351–52.  Farrell talked with Wells for about ten minutes.  *Id.* at 349.  By the end of that time, Farrell testified, Wells was mostly dressed but was unsteady when he stood.  *Id.* at 354–55.

By this time, Farrell stated, Gutierrez had arrived, and Farrell told him that he intended to have Wells taken to a hospital.  *Id.* at 355–56.  A police vehicle arrived to take Wells to the hospital, and Farrell led Wells from his cell.  *Id.* at 364.  Wells had so much trouble walking that Farrell did not think that he could get into the police wagon, so Farrell had Wells sit down in a chair outside his cell and called an ambulance instead.  *Id.* at 365–66.  Farrell acknowledged that Wells's arrest report said he was

8

released at 10:15 p.m., but he stated that 10:15 was just the time he completed the paperwork. *Id.* at 409–10. He said that Wells was waiting for the ambulance by then and was no longer in custody. *Id.* at 410. Farrell also said that if Wells had been quicker to get ready and had not shown signs of distress, he could have left the police station before 9:30 p.m. *Id.* at 410. A reasonable jury could use Farrell's testimony to find that Wells was no longer under arrest by some time before 9:30 p.m. on April 27.

In sum, there is a genuine factual dispute regarding whether Wells was in custody for more than forty-eight hours. A reasonable jury could find that police did not arrest Wells until 10:20 p.m. on April 25 and that they released Wells before 9:30 p.m. on April 27.

### 2. Purpose of detention

Plaintiff argues that even if police held Wells for less than forty-eight hours, she is still entitled to summary judgment, because police unreasonably delayed providing Wells with a probable cause determination by a judge. She argues that police held Wells while investigating to obtain evidence to bring felony charges against him and contends that this violated his Fourth Amendment rights.

"A jurisdiction that provides judicial determinations of probable cause within 48 hours will, as a general matter, comply with the . . . requirement" of prompt presentation before a judicial officer. *County of Riverside*, 500 U.S. at 56. To establish a constitutional violation, a plaintiff held less than forty-eight hours before he was given a judicial probable cause hearing has the burden of showing the detention was unreasonable. *See, e.g., Ortiz v. City of Chicago*, 656 F.3d 523, 539 (7th Cir. 2011).

"Examples of unreasonable delay are delays for the purpose of gathering

9

additional evidence to justify the arrest, a delay motivated by ill will against the arrested individual, or delay for delay's sake." *County of Riverside*, 500 U.S. at 56. Plaintiff contends that the police delayed Wells' presentment before a judicial officer in order to gather more evidence to support criminal charges against him.

The Seventh Circuit's cases reflect some conflict in its reading of *County of Riverside's* statement that delay for "gathering additional evidence to justify the arrest" is unreasonable. In *United States v. Sholola*, 124 F.3d 803, 820 (7th Cir. 1997), the court read this only as a prohibition on prolonging detention to attempt to establish probable cause for an arrest for which probable cause was lacking in the first instance. And in *United States v. Daniels*, 64 F.3d 311 (7th Cir. 1995), the court said that *County of Riverside* does not preclude the police from bolstering their case against a defendant while he awaits presentment before a judge. *Id.* at 314. In *Daniels*, the police held the defendant while arranging and conduct a lineup to attempt to gain additional evidence on the charge for which they had arrested him. The court concluded that this did not violation the defendant's Fourth Amendment rights. The court stated:

> Daniels' argument seems to interpret *Riverside* to preclude law enforcement from bolstering its case against a defendant while he awaits his *Gerstein* hearing; that is a ludicrous position. *Gerstein* and its progeny simply prohibit law enforcement from detaining a defendant to gather evidence to justify his arrest, which is a wholly different matter. Probable cause to arrest Daniels already existed and that is what [the officer's] affidavit reported. We therefore reject Daniels' contention that he did not receive a prompt *Gerstein* hearing.

*Id.* On the other hand, in *Willis v. City of Chicago*, 999 F.2d 284 (7th Cir. 1993), the court noted that the defendant had argued the plaintiff "was not held beyond [an intervening] court call so that the . . . crimes for which he had been arrested could be

10

investigated further. [*County of Riverside*] *would clearly prohibit such a presentment delay* because it would be for the purpose of gathering evidence to justify the arrest." *Id.* at 288 (emphasis added). The court also concluded in *Willis* that prolonging the detention of an arrestee to investigate crimes other than the one for which he had been arrested violated the Fourth Amendment. *Id.* at 288-89.

Though reconciling these decisions is not all that easy, it appears that the Seventh Circuit has concluded, with respect to post-arrest detention of less than forty-eight hours, that delay in presentment in order to further investigate the offense for which the defendant was arrested passes muster under *County of Riverside* if, but only if, the arrest was supported by probable cause in the first instance. If, on the other hand, the authorities delay the arrestee's presentment in court so that they can investigate other offenses, the delay is unreasonable and violates the Fourth Amendment.

Plaintiff argues that *Lopez v. City of Chicago*, 464 F.3d 711 (7th Cir. 2006), indicates that delaying a prisoner's probable cause determination in order to gather evidence is never permissible. Lopez was held without a probable cause determination for five days, and thus the burden was on law enforcement to show an extraordinary circumstance that justified the delay. *Id.* at 721–22. The police offered no justification. The court stated that "[*County of Riverside*] held unequivocally that delays for purposes of gathering evidence are per se unreasonable." *Id.* at 722. In context, however, it is clear that the court was addressing delays of more than forty-eight hours, because that is what was at issue in the case. The Seventh Circuit has not clearly applied the same *per se* prohibition to delays of less than forty-eight hours.

11

In the present case, there is no evidence that the police delayed Wells'
presentment in court to investigate him for anything other than the offense for which he
was arrested in the first place, namely reckless driving and other potential offenses
arising from the collision. Thus the delay passes constitutional muster if probable cause
existed at the time Wells was taken into custody.

Probable cause to arrest exists if the arresting officers possess "knowledge from
reasonably trustworthy information that would lead a prudent person to believe that a
suspect has committed a crime." *United States v. McCauley*, 659 F.3d 645, 649 (7th
Cir. 2011). Under Illinois law, a person commits the offense of aggravated reckless
driving, a felony, by "driv[ing] any vehicle with a willful or wanton disregard for the safety
of persons or property" and causing great bodily harm. 625 ILCS 5/11-503(a)(1), (c). A
driver of a motor vehicle commits reckless homicide "if his acts whether lawful or
unlawful which cause the death are such as are likely to cause death or great bodily
harm to some individual, and he performs them recklessly." 720 ILCS 5/9-3.

A reasonable jury could find that the police had probable cause to arrest Wells
for the offenses of aggravated reckless driving or reckless homicide. Wells's actions
killed two people and injured many more. There is evidence that police had information
that Wells had driven at high speed through a red light, across four lanes of traffic, and
into a bus station and then a train station. Indiv. Defs. Resp., Ex. D at 47. In addition,
there was no indication that Wells had tried to stop or brake. *Id.* at 72–73. In particular,
no witness at the scene of the collision said that Wells tried to brake; video of the
collision did not show the truck coming to a stop even as it went through the bus station;
and there were no skid marks indicating that Wells had attempted to brake. *Id.*, Ex. B at

12

44 & Ex. D at 73. Musial testified that there was a witness who had seen Wells driving his truck eighty miles per hour on the expressway before exiting and hitting the bus and train stations. *Id.*, Ex. B at 135–36. Police also found several bottles of medication in the cab of the truck. *Id.* at 81–84.

If the jury finds – as a reasonable jury could – that the police had probable cause to arrest Wells for these offenses, their detention of him for less than forty-eight hours would not have been unlawful under Seventh Circuit authority even if the police were further investigating the collision during that interval. Gutierrez testified that he thought that the police could hold Wells for forty-eight hours to gather information and relay the information to the State's Attorney. Pl. Ex. 4 at 46. He also said that it was proper to hold Wells because the investigation could have resulted in felony charges. *Id.* at 182. Deneen stated that police could hold Wells for forty-eight hours because they were investigating him for felony charges that could include reckless homicide. Pl. Ex. 4 at 118–19. A reasonable jury could find that the police held Wells while investigating the collision to bolster their case against Wells on the charges for which they had arrested him.

Plaintiff also contends that even if police initially had probable cause to arrest and hold Wells, probable cause dissipated because they learned facts showing that he had not committed a crime. "[T]he continuation of even a lawful arrest violates constitutional rights when the police discover additional facts dissipating their earlier probable cause." *Hernandez v. Foster*, 657 F.3d 463, 479 (7th Cir. 2011) (internal quotation, ellipses, and brackets in original omitted). If probable cause dissipates, a prisoner can no longer be held, even if less than forty-eight hours has elapsed. *Id.* at

13

481.

Plaintiff states that an initial blood test of Wells showed that he did not have alcohol in his bloodstream. Pl. Reply, Ex. 10 at 71–72, 111–12. She contends that doctors knew that the blood test was negative by 7:47 p.m. on April 25. *Id.*, Ex. 8 at 8. Butkus testified that later that same night, a nurse told her that the blood test had been negative for alcohol and drugs. Pl. Ex. 3 at 125–26. Plaintiff also states that a witness at the scene of the collision said that Wells was slumped over behind the wheel, lying down, and not looking up, and that the truck had been traveling at only thirty or thirty-five miles per hour. Pl. Reply, Ex. 21 at 17–20. Plaintiff argues that this evidence dissipated probable cause.

The evidence plaintiff has offered does not suffice to dissipate probable cause as a matter of law. Probable cause requires more than mere suspicion, but it does not require virtual certainty. *See, e.g., Luellen v. City of East Chicago*, 350 F.3d 604, 611 (7th Cir. 2003). Police did not arrest Wells for driving while intoxicated but rather for reckless driving. The fact that he apparently had not used drugs or alcohol before driving did not necessarily rule out the possibility that he had driven recklessly. And the fact that one witness saw Wells passed out behind the wheel of his truck does not, as a matter of law, wipe from the board the other evidence, including statements from other eyewitnesses, suggesting that the collision was a product of reckless driving. A reasonable jury could find that probable cause had not dissipated.

For these reasons, the Court denies both sides' motions for summary judgment on the unlawful detention claim.

14

**B.     Admissibility of testimony by plaintiff's expert**

The City argues that the Court should bar plaintiff's police procedures expert,

Dennis K. Waller.  It argues that Waller is not qualified as an expert, his methodology is

unreliable, and he does not apply that methodology in a sound manner.

Federal Rule of Evidence 702 states:

A witness who is qualified as an expert by knowledge, skill, experience,
training, or education may testify in the form of an opinion or otherwise if:
(a) the expert's scientific, technical, or other specialized knowledge will
help the trier of fact to understand the evidence or to determine a fact in
issue;
(b) the testimony is based on sufficient facts or data;
(c) the testimony is the product of reliable principles and methods; and
(d) the expert has reliably applied the principles and methods to the facts
of the case.

The rule adopts the analysis of *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579

(1993), and is "designed to ensure that any and all scientific testimony or evidence

admitted is not only relevant, but reliable."  *United States v. Parra*, 402 F.3d 752, 758

(7th Cir. 2005) (internal quotation marks omitted).

The City first challenges Waller's qualifications.  It argues that since January

2007, Waller has not served an expert in any case that involved claims of denial of

medical treatment or unlawful detention.  This does not preclude him from testifying.

"[T]here is a first time in court for every expert."  *Parra*, 402 F.3d at 758.  In any event,

another court in this district accepted Waller as an expert on police procedures related

to the medical care of prisoners awaiting trial.  *See Egebergh v. Sheahan*, No. 96 C

8563, 2001 WL 15945, at *10 (N.D. Ill. Jan. 4, 2001) (finding that Waller could not offer

medical opinions but could discuss procedures and appropriate responses to prisoners

with medical issues).

The City also argues that Waller's extensive training and experience in police procedures and practices does not include specific training in the medical care and detention of arrestees. Waller's extensive background in law enforcement, including his own training, his lengthy experience as a law enforcement officer and consultant, and ish training and teaching of other law enforcement officers (including, among other things, prisoner safety), provides him with a sufficient basis to testify as an expert regarding proper police practice involving medical care of detainees, even though he may have less experience in that particular area than in some others. City Ex. 1 at 1–2; *see Parra*, 402 F.3d at 758 ("a court should consider a proposed expert's full range of practical experience as well as academic or technical training when determining whether that expert is qualified to render an opinion in a given area" (internal quotation marks omitted)). The arguably limited extent of his expertise in this area is an appropriate subject of cross-examination and argument about the weight to be given his opinions, but it does not render his opinions inadmissible. *See Spearman Indus. v. St. Paul Fire & Marine Ins. Co.*, 138 F. Supp. 2d 1088, 1096 (N.D. Ill. 2001); *see also Dewick v. Maytag Corp.*, 324 F. Supp. 2d 894, 898 (N.D. Ill. 2004) (expert in appliance accident prevention was qualified to analyze safety issues related to broiler and infant children, even though he never had before).

The City also contends that Waller either has no methodology or that his methodology is unreliable. It claims that Waller merely highlights portions of the evidentiary record and then offers an opinion that the evidence supports plaintiff's case. Waller, by contrast, describes his methodology as a four-step process: he develops an understanding of the facts, he analyzes the actions of the officers and other participants,

he compares the officers' actions with standards of training and practice, and he explains whether the actions of the officers were consistent or inconsistent with those standards. City Ex. 1 at 5.

Expert testimony must "be the product of reliable principles and methods." *United States v. Conn*, 297 F.3d 548, 555 (7th Cir. 2002). "The measure of intellectual rigor," however, "will vary by the field of expertise." *Id.* at 556 (internal quotation marks omitted). A court may focus "on personal knowledge or experience" of the expert when determining reliability. *United States v. Brumley*, 217 F.3d 905, 911 (7th Cir. 2000) (internal quotation marks omitted) (expert testimony was proper when limited to area of expertise and training and areas in which it would help the jury); *see Kumho Tire Co. V. Carmichael*, 526 U.S. 137, 156 (1999) ("expert [may] draw a conclusion from a set of observations based on extensive and specialized experience"). Waller's application of his training, knowledge, and experience to assess whether police officers' actions were consistent with accepted standards and practices constitutes a sufficiently reliable methodology.

For any expert testimony, "the ultimate test is whether the testimony would assist the trier of fact in understanding the evidence." *United States v. Hall*, 93 F.3d 1337, 1342 (7th Cir. 1996). Therefore, expert testimony can be barred when it is unhelpful to the jury, and it can be excluded under Federal Rule of Evidence 403. *See Thompson v. City of Chicago*, 472 F.3d 444, 457 (7th Cir. 2006). If an expert's testimony is helpful to the jury, it is admissible even if it "cover[s] matters that are within the average juror's comprehension." *Hall*, 93 F.3d at 1342. On the other hand, expert testimony is improper if it usurps the jury's function. *United States v. Farrell*, 563 F.3d 364, 377–78

17

(8th Cir. 2009) (expert improperly commented on strength of government case, credibility of witnesses, and fact finding role of jury). In *Thompson*, the court upheld the district court's preclusion of expert testimony on whether certain conduct amounted to excessive force, because the jury could determine whether the force was objectively reasonable just as easily as an expert. *Thompson*, 472 F.3d at 457–58. Similarly, this Court has barred expert testimony regarding a party's intent, in a situation in which the expert merely "dr[ew] inferences from the evidence," which the jury could draw equally well. *Dahlin v. Evangelical Child & Family Agency*, No. 01 C 1182, 2002 WL 31834881, at *3 (N.D. Ill. Dec. 18, 2002); *accord Hershey v. Pac. Inv. Mgmt. Co. LLC*, 697 F. Supp. 2d 945, 949–50 (N.D. Ill. 2010).

Another judge in this district recently barred testimony by Waller to the effect that a police report was false because it conflicted with other statements in the record. *Davis v. Duran*, No. 08 C 6314, 2011 WL 2277645, at *6–7 (N.D. Ill. June 10, 2011). The judge determined that Waller was "usurping the jury's function to weigh evidence and make credibility determinations" and was not using any reliable methodology. *Id.* at *7 (internal quotation marks omitted); *see also Gell v. Town of Aulander*, No. 2:05-CV-00021-FL, 2008 WL 4845823 (E.D.N.C. Nov. 4, 2008) (police procedures expert could not testify that reports were fabricated when that determination required credibility determination). The same judge precluded Waller from offering an opinion about the trajectory of a bullet because he had no expertise in ballistics or forensic medicine and merely combined the deposition of a medical examiner and eyewitness testimony to reach his conclusion. *Davis*, 2011 WL 2277645, at *9.

Waller has offered fourteen opinions, which the Court considers in turn. In doing

18

so, the Court operates on the assumption that all of plaintiff's claims are legally viable, including her "policy" claims against the City.

### 1. Opinion A

Waller's opinion A is that a trained police officer or civilian employee acting properly who knew at least some of the relevant information about Wells would have taken action to get Wells medical treatment. City Ex. 1 at 9. Waller is qualified to give this opinion because of his training and experience in police procedures. He uses that training and knowledge to determine that, under the facts of the case, proper police procedure would require providing medical treatment to Wells.

Waller assumes the existence of disputed facts to render his opinion. This does not render his opinion inadmissible; that is what experts commonly do. The City argues, however, that Waller's characterization of some of the evidence indicating that Wells was disoriented and staggering is distorted. An accident report written by Musial at the hospital the night of the collision states that Wells was disoriented and confused. City Ex. 9. Waller takes this to mean that Wells was disoriented at the hospital after the collision. City Ex. 1 at 9. The City contends that although Musial wrote the report at the hospital, he actually observed Wells to be coherent at the hospital and only considered Wells to be confused at the scene of the collision. *See* City Ex. 8 at 250–51. Waller also uses testimony from Butkus to state that Wells was staggering and needed assistance as he left the hospital. City Ex. 1 at 9. But the City claims that Butkus testified only that Wells was unsteady, and it says that it is not uncommon for a person to need assistance getting into a police wagon. City Ex. 11 at 116–18.

Though the facts on which an expert bases his opinion must have some basis in

the record, there is no requirement that the basis must consist of undisputed evidence. The Court finds that the matters on which Waller relies for this opinion are sufficiently based in the record, even if they are subject to a contrary interpretation. Musial's report was written after he had seen Wells at the hospital, and the jury need not believe that his observation that Wells was disoriented referred only to the time of the collision. Additionally, Butkus did say that Wells was unsteady and that he needed help into the police wagon.

The Court therefore declines to exclude opinion A. *See Walker v. Soo Line R.R.*, 208 F.3d 581, 586–87 (7th Cir. 2000) (doctor who based opinion on patient's inaccurately reported medical history could still give opinion, with the inaccuracies subject to cross-examination); *see Ortiz*, 656 F.3d at 537 (failure of medical expert to consult victim's primary care physician affected only weight and not admissibility of opinion). *See also Schnur v. Kohl's Dept. Stores, Inc.*, No. 06 C 3040, 2010 WL 4930687, at *2 (N.D. Ill. Nov. 29, 2010) (expert could consider only some evidence in reaching his conclusion; opposing party was free to attack the foundations of the report and its weight).

## 2. Opinion B

Waller's opinion B is that Wells's condition was known and obvious to the police or that they could have determined it easily. City Ex. 1 at 11. He also states that Wells displayed many of the warning signs listed by Chicago Police Department guidelines for screening arrestees. *Id.* Waller can appropriately testify to the latter opinion, specifically that the record reflects that Wells had symptoms that were recognized by the Department's guidelines. The remainder of this opinion, however, amounts to

commentary regarding the officers' state of mind, which the Court excludes. *See Hershey*, 697 F. Supp. 2d at 949–50.

### 3.     Opinion C

Waller's opinion C is that even though the City had a policy of reviewing the hospital release papers of arrestees, lockup workers ignored this. City Ex. 1 at 12. This opinion is inadmissible. Waller is not using his expertise or knowledge to assess the adequacy of the policy adopted by the City or compare it with standard practices. Rather, he has done nothing more than cite evidence in the record that he contends reflects the policy was not followed. The jury is equally qualified to make this determination, and Waller's opinion would provide them with no meaningful assistance.

### 4.     Opinion D

Waller's opinion D is that even though police officers were aware that Wells needed medical treatment, they did nothing to obtain treatment for him while he was in custody. *Id.* at 13. This opinion is inadmissible. For the first part of this opinion, Waller again opines on the state of mind of the police officers, which he is no more qualified to do than the jury. For the second part, Waller does not apply his expertise but only summarizes the evidence indicating that various police officers knew of Wells's injuries and did not get him medical attention. He is no better placed to review these facts than the jury; his opinion is not an expert opinion. *See Hall*, 93 F.3d at 1343 (opinion offered must be an expert opinion, not just an opinion offered by a supposed expert); *Dowe v. National R.R. Passenger Corp.*, No. 01 C 5808, 2004 WL 887410, at *1 (N.D. Ill. Apr. 26, 2004) (expert must contribute something beyond the knowledge possessed by an ordinary juror).

### 5.    Opinion E

Waller states in opinion E that the police officers involved in this case violated

"the *Law Enforcement Code of Ethics*, which the Chicago Police Department has

incorporated into their rules and regulations as a general standard of conduct for all

sworn members of the department."  City Ex. 1 at 14.  In particular, he contends they

violated obligations to safeguard lives, be mindful of the welfare of others, respect

constitutional rights, and so on.  The opinion is far too general to be helpful to the jury in

determining whether plaintiff has proved her claims.  It is inadmissible.

### 6.    Opinion F

Waller's opinion F is that police kept Wells in custody in a way that was

consistent with City practice and custom but inconsistent with Illinois statutes and

standards and the City's express policies.  *Id.* at 15.  The latter opinion is admissible for

the same reasons as opinion A.  Waller uses his expertise and knowledge of police

standards and practice to determine whether the actions of the police were consistent

with those standards.

Waller appears to base the first part of this opinion (that the police acted

consistent with department custom and practice) on a class action lawsuit, *Dunn v. City*

*of Chicago*, No. 04 C 6804 (N.D. Ill.), in which the plaintiffs alleged that the City violated

the rights of arrestees in various ways in connection with the length and conditions of

their detention.  City Resp. Ex. B.  The parties in *Dunn* settled before judgment,

however, and their settlement agreement specifically stated that the City did not admit

any liability or unconstitutional conduct.  Pl. Resp., Ex. 10 at 12.  The simple fact that a

lawsuit was filed and then settled without an admission of liability has little or no

probative value in this context. Its admission would seriously risk confusing the jury. *See* Fed. R. Evid. 403. Because the *Dunn* case appears to provide the sole support for this aspect of opinion F, that part of the opinion is inadmissible.

### 7. Opinion G

Waller states in opinion G that the City has a custom or practice of failing to conduct appropriate monitoring of arrestees and denying them medical care. City Ex. 1 at 18. To support this opinion, he relies on one disciplinary investigation and eight prior lawsuits. This opinion is inadmissible. Waller is not using his expertise and knowledge of police practices. Rather, he has simply looked at a several past incidents and has inferred that they establish a custom or practice. The jury is equally qualified to assess the evidence and determine whether draw this inference. Further, as discussed below, many of the cases did not end with a finding of liability and thus their existence does not constitute probative evidence.

### 8. Opinion H

Waller's opinion H is that police did not provide Wells with medical care and that the lack of medical care led to his illness, hospitalization, and eventually death. *Id.* at 21. This opinion is inadmissible. Waller's conclusion that police did not provide medical care is similar to opinion D, and it is likewise inadmissible because it simply represents a summary of evidence that the jury is just as qualified to assess. In addition, Waller is not a medical expert and thus cannot properly render an opinion that the alleged lack of medical attention while detained led to Wells' death. *See Egebergh*, 2001 WL 15945, at *10 (likewise concluding that Waller is not qualified to give medical opinions).

### 9. Opinion I

Waller states in his opinion I that the City has not remedied practices that endanger arrestees who need medical care even though those practices are contrary to the City's own written policies. City Ex. 1 at 22. As evidence, Waller offers a summary of facts indicating that various police officers did not share information they had learned that indicated that Wells needed medical care. This opinion is similar to opinions C and D and therefore inadmissible, in that Waller merely offers a summary of evidence from the case, and there is no indication that his assessment of that evidence involves application of his expertise.

Waller does support his opinion with evidence that the City lacked guidelines regarding what an officer should do when he learns that an arrestee needs medicine or has a medical condition. *Id.* at 23. Waller also discusses evidence that police officers viewed the health of arrestees as purely the responsibility of the lockup keepers once an arrestee has been placed in the lockup. *Id.* Waller can discuss this evidence, using his expertise and knowledge of police practice to assess the adequacy of the City's practices in this regard.

### 10. Opinion J

Waller's opinion J is that the fifteen-minute visual checks of prisoners in city jails were required by City policy but in practice were done in an incomplete and random manner. *Id.* at 24. This opinion is inadmissible. Based on Waller's report, it appears that he has done nothing more than summarize evidence that he has reviewed. The opinion does not appear to involve application of Waller's expertise.

### 11. Opinion K

Waller states in his opinion K that Wells was in custody for more than fifty-three hours and that the length of custody was not justified by the investigation that the police conducted. City Ex. 1 at 27. This opinion is not admissible. Waller is simply looking at disputed evidence and determining how long Wells was in custody, something the jury is equally qualified to do. The jury also does not need expert help in determining, as Waller asserts, whether probable cause dissipated or the investigation should have ended once Wells's toxicology tests came back negative. *See Stuart v. United States*, 23 F.3d 1483, 1487 (9th Cir. 1994) (expert no more qualified than jury to determine whether probable cause existed).

### 12. Opinion L

Waller's opinion L is that police held Wells in custody for more than fifty-three hours in violation of the law, City policy, and nationally accepted police policy. City Ex. 1 at 27. Although Waller mentions police policy in this opinion, his conclusion is a factual determination regarding how long Wells was in custody. As with opinion K, Waller is no more qualified than the jury to sift through the evidence and decide how long police held Wells. This opinion is inadmissible.

### 13. Opinion M

Waller states in his opinion M that holding Wells for an unconstitutional length of time was contrary to the City's express policy but consistent with its actual custom and practice. *Id.* at 30. Waller cites several City policies in support of this opinion. As evidence of the City's custom and practice, however, Waller offers only a statement by Gutierrez that police can always hold a suspect for forty-eight hours and an allegation

from the *Dunn* case, which as discussed above is inadmissible under Rule 403. As with opinion C, it does not appear that Waller is using his expertise here. The Court concludes that the jury is equally qualified to decide whether Gutierrez's statement reflects that the City had a practice of unlawfully detaining arrestees.

### 14. Opinion N

Waller's final opinion is that the City does not provide adequate training to its employees in assessing the mental and physical health of arrestees and providing them with medical care. This opinion is inadmissible, because Waller's report does not describe the factual foundation for it at all. His report merely states conclusions.

### 15. Conclusion

For the reasons stated above, Waller's opinion A is admissible. Opinions B, F, and I are admissible in part. Opinions C, D, E, G, H, J, K, L, M, and N are inadmissible.

## C. Unlawful detention claim against City

Both plaintiff and the City have moved for summary judgment on plaintiff's claim against the City that Wells was unconstitutionally detained because of a policy or practice of the City. The Court denied plaintiff's motion for summary judgment on her claim of unlawful detention against the defendant police officers and denies, for the same reasons, her motion for summary judgment on her unlawful detention claim against the City.

The City argues that plaintiff cannot show a policy or practice of the City that caused any unlawful detention that Wells suffered.

> Municipal entities cannot be held vicariously liable for the acts of their employees under Section 1983 on a *respondeat superior* theory. To establish liability, [a plaintiff] must produce evidence of (1) an express

policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority.

*Phelan v. Cook County*, 463 F.3d 773, 789 (7th Cir. 2006) (internal quotation marks omitted). The policy can be "an implicit policy or a gap in expressed policies." *Thomas v. Cook County Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2009). Plaintiff does not argue that there is an express written policy or that Wells' unlawful detention was caused by someone with final policymaking authority for the City. Instead, she contends that the City has a custom or practice of unlawfully detaining prisoners like Wells or an unlawful implicit policy regarding prisoners.

"To demonstrate that [a municipality] is liable for a harmful custom or practice, the plaintiff must show that [its] policymakers were deliberately indifferent as to the known or obvious consequences." *Id.* (internal quotation marks omitted). A plaintiff can show deliberate indifference by demonstrating "a series of bad acts creating an inference that municipal officials were aware of and condoned the misconduct of their employees." *Minix v. Canarecci*, 597 F.3d 824, 832 (7th Cir. 2010) (internal quotation marks omitted); *see Latuszkin v. City of Chicago*, 250 F.3d 502, 505 (7th Cir. 2001).

Plaintiff argues that the City had both a policy or practice of detaining prisoners for more than forty-eight hours without a judicial probable cause determination and a policy or practice of detaining prisoners for less than forty-eight hours for impermissible reasons. She has not, however, provided evidence to support a policy or practice of detaining prisoners for more than forty-eight hours. A Chicago Police Department

27

general order in existence at the time of Wells' detention states that "*[e]very person arrested without a warrant, who is not eligible to be released on bond or has not been released without charging, **will appear in court, without unnecessary delay. Under no circumstances, will such a person appear in court any later than 48 hours from the time of arrest.**"* Pl. Reply, Ex. 31 at 2 (emphasis in original). The only evidence that plaintiff offers in response is the *Dunn* class action suit referenced earlier, in which the plaintiffs claimed that the City had a policy of holding persons arrested without a warrant for more than forty-eight hours without a judicial determination of probable cause. City Resp., Ex. B at 20–21. As discussed above, the parties in *Dunn* settled, and their settlement agreement specifically stated that the City did not admit any liability or unconstitutional conduct. Pl. Resp., Ex. 10 at 12. In her summary judgment papers, plaintiff cites only the settlement agreement, not any evidence developed in the *Dunn* case or otherwise. No reasonable jury could find the existence of a policy or custom from this without more.

Plaintiff has, however, presented evidence from which a reasonable jury could find that the City had a policy of holding prisoners for impermissible reasons. As the Court has noted, even when police hold a prisoner for less than forty-eight hours, they violate his Fourth Amendment rights if they delay a judicial probable cause determination unreasonably. *County of Riverside*, 500 U.S. at 56. The City's written policy recognizes this by providing both that a prisoner should appear in court "without unnecessary delay" and no more than forty-eight hours after arrest. Pl. Reply, Ex. 31 at 2.

Plaintiff has provided evidence that would allow a reasonable jury to find that

28

police officers did not understand this prohibition on unreasonable delay and thought

that they could hold prisoners for forty-eight hours regardless of the circumstances.

Gutierrez testified that he understood that whenever there was an investigation of a

death, a suspect could be held for forty-eight hours "[t]o gather information and relay

that information to the State's Attorney's office." Pl. Ex. 4 at 46, see id. at 181–82.

Deneen testified that the police have forty-eight hours to charge or release a suspect.

Pl. Ex. 5 at 105. He also stated that the police could hold someone forty-eight hours

while there was an ongoing investigation. Id. at 118. A reasonable jury could find that

the two officers were unaware that under some circumstances it would be unreasonable

to hold a prisoner for forty-eight hours without a judicial probable cause determination.

A reasonable jury could also find that the investigators were unaware that an

investigation to justify an arrest is an improper reason to delay bringing a prisoner

before a judge.

Plaintiff has also presented evidence that the City's policy was to allow police to

hold prisoners for forty-eight hours regardless of the reason or that it was aware that its

police officers thought that this was its policy. In discovery, plaintiff asked the City to

provide a responsible official to discuss its policies regarding detaining prisoners for less

than forty-eight hours. See Fed. R. Civ. P. 30(b)(6). The City offered police

commander Joseph Salemme who, during his deposition, made statements that would

allow a jury to find that the City had a unconstitutional detention policy. Salemme stated

that prisoners had to be given a judicial probable cause determination or released within

forty-eight hours. Pl. Ex. 7 at 92. Although he testified that "[w]e don't hold people in

custody just to hold them in custody," he did not know of any specific policies

29

concerning the release of prisoners before forty-eight hours had passed. *Id.* at 92–93.

He also testified that a key element of any investigation was to allow the State's

Attorney's office to make its charging decisions before police released the prisoner. *Id.*

at 116, 139–40.

A reasonable jury could find, based on the admissible evidence offered by

plaintiff, that the City had a policy or custom that permitted holding all prisoners for forty-

eight hours regardless of circumstances and regardless of whether this would constitute

unreasonable delay under the Fourth Amendment.  There is also sufficient evidence

from which a reasonable jury could conclude that this policy or custom was "the direct

cause or moving force behind the constitutional violation, which a plaintiff may show

directly by demonstrating that the policy is itself unconstitutional." *Minix*, 597 F.3d at

832 (internal quotation marks omitted).  By contrast, as discussed earlier, no reasonable

jury could find, based on the evidence offered by plaintiff, that the City had a policy or

custom of detaining prisoners for more than forty-eight hours without a probable cause

determination.

For these reasons, the Court grants summary judgment in favor of the City on

plaintiff's unlawful detention claim insofar as the claim is based on a policy of holding

prisoners more than forty-eight hours and but denies the motion insofar as the claim is

based on a policy of holding prisoners unlawfully for less than forty-eight hours.

**D.     Failure to provide medical care claim against City**

The City has moved for summary judgment on plaintiff's claim that the City had a

policy or practice that caused Wells to be denied medical care in violation of his

constitutional rights.  The legal standard for establishing a policy is the same as for the

30

unlawful detention claim discussed in the previous section.  The City argues that plaintiff

has not offered evidence from which a reasonable jury could find the existence of a

policy that caused police to improperly deny Wells medical care.  Plaintiff argues that

her evidence establishes that the practices of the police led to such a large number of

injured arrestees that the City's policymakers must have been deliberately indifferent

the denial of medical care.

The Seventh Circuit has stated that

> [t]he usual way in which an unconstitutional policy is inferred, in the
> absence of direct evidence, is by showing a series of bad acts and inviting
> the court to infer from them that the policymaking level of government was
> bound to have noticed what was going on and by failing to do anything
> must have encouraged or at least condoned, thus in either event adopting,
> the misconduct of subordinate officers.

*Jackson v. Marion County*, 66 F.3d 151, 152 (7th Cir. 1995).  Proof of one or two bad

acts is insufficient to establish a widespread unconstitutional practice of which

policymakers must have been aware.  *Palmer v. Marion County*, 327 F.3d 588, 596 (7th

Cir. 2003); *Jackson*, 66 F.3d at 152.  Even multiple occurrences are insufficient unless

plaintiff "weave[s] these separate incidents together into a cognizable policy."  *Phelan*,

463 F.3d at 790.

Plaintiff's primary evidence is a series of nine previous incidents:  one internal

investigation of a death in a city lockup and eight lawsuits with allegations that police did

not provide adequate medical care for detainees.  The internal investigation involved the

death of Lewis Howard, who died in police custody in 2003.  By the time that Howard's

death was noticed, he had been dead long enough to show significant lividity and rigor

mortis.  An investigation initially determined that Chicago police officer Levi Roberts

should be disciplined because he had not properly conducted fifteen-minute checks and had not noticed that Howard had died, but this was later changed, and no charges were sustained against Roberts. City Reply, Ex. C.

In seven of the eight other cases plaintiff offers, there was or has been no determination that the plaintiffs were unconstitutionally been denied medical care. Two of them, *Ortiz v. City of Chicago*, No. 04 C 7423 (N.D. Ill.), and *Paine v. City of Chicago*, No. 06 C 3173 (N.D. Ill.), are still pending cases. In four cases, *Guardino v. City of Chicago*, No. 04 C 45; *Calderon v. City of Chicago*, No. 06 C 3502; *Williams v. City of Chicago*, No. 07 C 5951; and *Butko v. City of Chicago*, No. 07 C 4207, the City settled with the plaintiffs and did not admit liability or wrongdoing. In *Moore v. Morales*, No. 04 C 2545, the court granted summary judgment in favor of the City on Moore's medical care claim.

Plaintiff has provided affidavits and deposition testimony from Calderon and Williams, two of the plaintiffs who settled with the City. Calderon states that he was involved in an accident and arrested. Pl. Resp., Ex. 34 at 1. Despite injuries from the accident, including pieces of glass lodged in his skin, Calderon was detained by police and was not given any medical attention. *Id.* at 1–2. He claims that his injuries worsened because he was not treated and that he had to receive therapy for injuries to a finger and that he now suffers chronic pain in his leg. *Id.* at 2. Williams states that he was arrested and that when the police were holding him, he suffered from diarrhea and vomiting. *Id.*, Ex. 35 at 1. Police initially denied medical treatment. When he attempted to contact the Office of Professional Standards, an officer smashed him into a wall and repeatedly kicked him in the back. *Id.* at 1–2. He was so ill that deputies at the criminal

32

court would not accept custody of him from the Chicago police, but he was never taken to a hospital. *Id.* at 2.

Of the cases offered by plaintiff, only in *Cobige v. City of Chicago*, 651 F.3d 780 (7th Cir. 2011), was the City found liable for denying a prisoner medical care. *See id.* at 782. Patricia Cobige experienced abdominal pain while in police custody but never received medical care. Stress from the pain eventually caused her to suffer a heart arrhythmia and die. *Id.*

Plaintiff has thus provided only four incidents with evidence that a reasonable jury could use to find that police denied an arrestee medical care: the death of Howard, the testimony of Calderon and Williams, and *Cobige.* Combining these cases with the evidence in the present case, there is not enough to permit a reasonable jury to find a widespread unconstitutional practice sufficient to impose liability on the City. "It is not enough to demonstrate that policymakers could, or even should, have been aware of the unlawful activity because it occurred more than once." *Phelan*, 463 F.3d at 790. Rather, "[t]he plaintiff must introduce evidence demonstrating that the unlawful practice was so pervasive that acquiescence on the part of policymakers was apparent and amounted to a policy decision." *Id.* Although there is no evidence in the record regarding how many arrestees the City had custody of between 2003 and 2008, the period during which the five incidents took place, five unconnected incidents cannot establish that an unlawful practice was pervasive in the police department of a large city like Chicago.

Plaintiff also offers the expert opinions of Waller to support her claim. Among his admissible opinions, there are two that concern whether the City had a policy or practice

that resulted in the denial of medical care to Wells. Waller opines that the City had no policy dictating that police pass on the medical information they obtained concerning a prisoner and that police did not think that they had any responsibility to do so once the prisoner had been accepted by the lockup. City Ex. 1 at 23. Waller also opines that the fifteen-minute checks required by Chicago police policy were often performed in a perfunctory manner or were skipped. *Id.* at 24–27. The lack of an effective policy, however, generally is not unconstitutional by itself. *See Calhoun v. Ramsey*, 408 F.3d 375, 380 (7th Cir. 2005) ("absence of a policy might reflect a decision to act unconstitutionally," but the inference should be drawn with caution and only when there is evidence of a pervasive custom or practice). Plaintiff's inability to provide evidence from which a reasonable jury could find a widespread practice of denying medical treatment to prisoners is fatal to her claim against the City.

## Conclusion

For the reasons stated above, the Court denies plaintiff's motion for partial summary judgment [dkt. no. 211] and grants in part defendant City of Chicago's motion for summary judgment [dkt. no. 217]. The Court grants summary judgment in favor of the City on count 3, plaintiff's claim against the City for denial of medical care, and on count 11, plaintiff's claim against the City for unlawful detention, to the extent the latter claim involves an alleged policy of holding arrestees for more than forty-eight hours without a probable cause determination. The Court denies the remainder of the City's summary judgment motion. The case is set for a status hearing on January 23, 2012 at 9:30 a.m. The Court advises that it may be necessary to make a modest adjustment in the currently-set trial date. Counsel appearing at the status hearing must have the trial

34

schedules of all trial counsel in the case and should be prepared to advise the Court

how long they expect the trial to take in light of the rulings made in this decision.


                                           s/ Matthew F. Kennelly
                                        MATTHEW F. KENNELLY
                                        United States District Judge

Date:  January 16, 2011