**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **ANN DARLENE WELLS, as representative** )<br>**of the estate of Donald L. Wells, deceased,** )<br> )<br> **Plaintiff,** )<br> )<br> **vs.** )<br> )<br>**CITY OF CHICAGO, et al.,** )<br> )<br> **Defendants.** ) | **Case No. 09 C 1198** |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Ann Darlene Wells, as representative of the estate of Donald L. Wells, has sued

the City of Chicago and a number of Chicago police officers and employees for claims

arising from his arrest, confinement, and death. In April 2012, a jury returned a verdict

for plaintiff against the City and four of the defendant officers on plaintiff's unlawful

detention claim. The jury awarded plaintiff $1 million in compensatory damages against

all of the defendants and a total of $150,500 in punitive damages against the four

officers. The jury found for all defendants on plaintiff's claims relating to denial of

medical care.

Defendants have moved for judgment as a matter of law on plaintiff's claim or, in

the alternative, a new trial or remittitur on the issue of damages. For the reasons stated

below, the Court grants defendants' motion in part and denies it in part.

### Background

The present decision assumes familiarity with the Court's January 16, 2012

decision on the parties' summary judgment motions [docket no. 269].

On Friday April 25, 2008, Donald Wells (Wells), a resident of Michigan, drove his semi-trailer truck through a bus stop and into a Chicago Transit Authority "L" Station located on Cermak Road in Chinatown. Two women were killed, and twenty people were injured. Firefighters removed Wells from the cab of his truck, and paramedics transported him to a hospital.

At the hospital, Chicago police officer Joann Butkus and her partner Rachel Golubiak were waiting for Wells when he arrived in an ambulance shortly before 6 p.m. Butkus followed Wells into the emergency room and stayed close to him while he received treatment for his injuries. Shortly after Wells arrived at the hospital, police investigator Michael Deneen read Wells his *Miranda* rights and interviewed him for ten or fifteen minutes. Police investigator Elliott Musial formally arrested Wells at 10:20 p.m., and police transported him to a police station shortly thereafter. Wells was interviewed at the station and then placed in a holding cell during the early morning hours of April 26.

Wells remained at the police station until Sunday, April 27. During this time, police investigated the collision and considered, in consultation with the Cook County State's Attorney's Office, whether to charge Wells with a felony such as aggravated reckless driving or reckless homicide. Wells was never taken before a judge for a probable cause hearing. In the early afternoon on April 27, police learned that tests performed on Wells on April 25 showed that he had no illegal drugs or alcohol in his system after the accident. Ultimately he only received a traffic citation, though police kept investigating the collision until the time of his death.

2

On April 27, police captain John Farrell arrived at the station around 9:00 p.m. and told Wells that a decision on his release would be made shortly. Farrell then learned that Wells would not be charged with a felony. Farrell testified that before 9:30 p.m., he went to Wells's cell and told him that he was being released. Farrell noticed that Wells had removed all his clothes and became concerned that he might need medical attention and had nowhere to go once released. Farrell left Wells in the cell and went looking for the telephone number of one of Wells's family members. When he returned, Farrell found that Wells had again removed his clothes and saw signs that Wells had been urinating on the floor and defecating on himself. Farrell decided to send Wells to a hospital for evaluation. He initially called for a police vehicle, but after finding that Wells had difficulty walking once removed from his cell, Farrell instead called an ambulance. Wells's arrest record states that he was released from custody at 10:15 p.m. The ambulance arrived and took Wells from the police station at 10:56 p.m. Wells remained hospitalized for six weeks, suffering from pneumonia, renal failure, and failure of multiple organs, and he was never discharged before his death on June 13.

Plaintiff filed this suit in February 2009, claiming that police unlawfully detained Wells and improperly denied him medical care. The case was tried to a jury in March–April 2012. On the detention claim, the jury was instructed that it could find for the plaintiff on liability if it determined that (1) he was kept in custody for more than forty-eight hours before being released or taken before a judge, or (2) he was held in custody less than forty-eight hours, but his release was improperly delayed by keeping him in custody even though (a) there was no probable cause to arrest in the first place, or (b) the police obtained information that dissipated probable cause. *See* Jury Instructions at

3

16–17 (docket no. 344).

After trial, the jury rendered a verdict in which it found for defendants on plaintiff's claims related to medical care but for plaintiff on the unlawful detention claim. In particular, the jury found that defendants Michael Deneen, Galo Gutierrez, Maureen McMahon, and Elliott Musial had unlawfully detained Wells and that the City had a policy of unlawful detention. The jury awarded compensatory damages of $1 million for pain and suffering and punitive damages in the amount of $500 against Deneen, $50,000 against Gutierrez, $50,000 against McMahon, and $50,000 against Musial.

## Discussion

Defendants contend that they are entitled to judgment as a matter of law on the unlawful detention claim against the individual defendants and the policy claim against the City. They also contend that they are entitled to a new trial on the issues of compensatory and punitive damages.

### A.     Judgment as a matter of law

The Court may grant judgment as a matter of law when "a reasonable jury would not have a legally sufficient evidentiary basis to find for the [nonmoving] party." Fed. R. Civ. P. 50(a)(1); see Thomas v. Cook County Sheriff's Dep't, 604 F.3d 293, 300–01 (7th Cir. 2009). The Court "do[es] not weigh evidence or assess the credibility of witnesses. Instead, [it] draw[s] all reasonable inferences in favor of the nonmoving party." Thomas, 604 F.3d at 300–01 (citations omitted).

Defendants contend that there was insufficient evidence for a reasonable jury to find that the individual defendants unlawfully detained Wells and that the individual defendants are entitled to qualified immunity. They also contend that there was

4

insufficient evidence for a reasonable jury to conclude that Chicago had a policy or practice of unlawful detention.

### 1. Unlawful detention

A person arrested without a warrant is entitled under the Fourth Amendment to "a prompt judicial determination of probable cause." *County of Riverside v. McLaughlin*, 500 U.S. 44, 47 (1991). It is generally sufficient if the government provides a probable cause hearing within forty-eight hours of arrest. *Id.* at 56. If the arrested person is held less than forty-eight hours without a judicial probable cause determination, to establish a constitutional violation he must show that the hearing "was delayed unreasonably." *Id.* By contrast, if police hold an individual more than forty-eight hours without providing a probable cause hearing, the government has the burden of "demonstrat[ing] the existence of a bona fide emergency or other extraordinary circumstance" to show that the individual's Fourth Amendment rights were not violated. *Id.* at 57.

### a. Detention of more than forty-eight hours

Defendants contend that plaintiff presented insufficient evidence for a reasonable jury to find that police held Wells for more than forty-eight hours or that they held him for less than forty-eight hours for an improper purpose. They argue that Wells was in police custody starting at 10:20 p.m. on April 25, when Musial formally arrested him, and ending around 9:15 p.m. on April 27, when Farrell told Wells that he was going to be released. Plaintiff contends that the defendants held Wells for more than forty-eight hours and that they held him for an improper purpose. Specifically, plaintiff claims that defendants they arrested Wells without probable cause and held him while investigating to justify his arrest and that they did not release him promptly when the evidence

5

showed he was not intoxicated, had gotten adequate sleep the night before the accident, and had a clean driving record. *See Riverside*, 500 U.S. at 56 (unreasonable to hold an arrestee while gathering information to justify his arrest).

The Court concludes that there was sufficient evidence for the jury to find that Wells was held more than forty-eight hours. First, a reasonable jury could have concluded that Wells was in custody before 10:20 p.m. on April 25. "An arrest requires either physical force . . . or . . . submission to the assertion of authority." *California v. Hodari D.*, 499 U.S. 621, 626 (1991) (emphasis omitted). Police are considered to have made a "show of authority" to which a person can submit "'only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" *Id.* at 627-28 (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980) (plurality)) (internal quotation marks omitted). "Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Mendenhall*, 446 U.S. at 554; *see Carlson v. Bukovic*, 621 F.3d 610, 619 (7th Cir. 2010) (adopting factors listed in *Mendenhall*). Other circumstances that could affect whether a reasonable person believes he is free to leave include whether he was ever told he was free to leave and "whether the suspect eventually departed the area without hindrance." *Deluna v. City of Rockford*, 447 F.3d 1008, 1014 (7th Cir. 2006) (internal quotation marks omitted). "The reasonable person–free to leave standard is an objective one, and both the officer's and the encountered individual's subjective beliefs during the

6

encounter are not determinative as to whether a seizure occurred." *Carlson*, 621 F.3d at 619 n.15.

Butkus testified that she and her partner Golubiak arrived at the scene of the accident and that their superior ordered them to follow the ambulance carrying Wells to the hospital. Def. Ex. C at 4–5. They arrived before Wells's ambulance and relieved other police officers who were already there. *Id.* at 6–7. Butkus testified that they followed Wells into the trauma center and remained close to him. *Id.* at 7–8. Butkus asked Wells questions at the hospital, and Wells told her that he had not been able to stop his truck and prevent the accident. *Id.* at 8. Looking for identification, she reached into and searched Wells's pants, which had been removed and placed under Wells's gurney. *Id.* at 10. She removed his wallet from the pants in order to locate identification. *Id.* at 10, 27. Butkus testified that she and her partner observed the hospital staff treating Wells and remained within fifteen or twenty feet of him while he was at the hospital. *Id.* at 11. Butkus also spoke with a nurse and learned that initial toxicology tests performed on Wells were negative for drugs or alcohol. *Id.*

Butkus testified that she had been ordered to maintain custody of Wells, and the jury heard deposition testimony in which Butkus stated that she considered Wells her prisoner and that she did not have authority to let him leave. *Id.* at 22–23. She testified that maintaining custody of Wells meant that she was "monitoring him and his movements and his condition, et cetera." *Id.* at 25. Butkus also stated that Golubiak followed Wells when Wells was taken from the emergency room to get a CT scan, and the jury heard deposition testimony in which Butkus stated that she herself had followed Wells at that time. *Id.* at 30–31.

7

Deneen arrived at the hospital at approximately 6:00 p.m, shortly after Wells,
Butkus, and Golubiak had arrived.  Def. Ex. C at 13–14; Def. Ex. D at 4.  Deneen
testified that he interviewed Wells for ten or fifteen minutes, and the jury heard
deposition testimony in which Deneen acknowledged reading Wells his *Miranda* rights.
Def. Ex. D at 5–6.  He stated that he did not interfere with Wells's medical treatment but
that any time medical staff moved away from Wells he moved back in to ask more
questions.  Def. Ex. E at 16.  During that time, Butkus and Golubiak remained just
outside the area where Wells was receiving treatment, within sight and less than twenty
feet away.  Def. Ex. C at 14.  Butkus also testified that two other detectives arrived to
question Wells later.  *Id.* at 15–16.  When Musial arrived at the hospital shortly after 10
p.m. to formally arrest Wells, he saw Butkus and Golubiak waiting near Wells.  Both
were wearing their police uniforms, and their sidearms were visible.  *Id.* at 21–22.

Considering all of this evidence, a reasonable jury could have concluded that a
reasonable person in Wells's situation would not have felt free to leave and that he was
in custody as early as 6 p.m., long before Musial formally arrested him.  The entire time
that Wells was at the hospital, two uniformed officers remained close by while multiple
detectives questioned him, one reading him his *Miranda* rights.  Although Butkus's
subjective intentions are not determinative, a reasonable jury could conclude that she
demonstrated by her demeanor and actions that she would not have let Wells go and
that a reasonable person in Wells's position observing this would have concluded that
he was not free to leave.  *See Mendenhall*, 446 U.S. at 554 n.6 (subjective intent can be
relevant to the extent that it is conveyed to person in custody).  Butkus testified that she
freely questioned Wells and rifled through his pants to look for identification.  In addition,

8

defendants do not point to any evidence indicating that they ever told Wells he was free to leave or could refuse to answer their questions. *See Deluna*, 447 F.3d at 1014.

Defendants contend that Wells could not have been seized by Butkus's actions at the hospital because a person is seized "only when there is governmental termination of freedom of movement through means intentionally applied." *Brower v. County of Inyo*, 489 U.S. 593, 597 (1989) (emphasis omitted). In *Brower*, however, the Supreme Court addressed a distinguishable situation in which a fleeing suspect had led the police on a twenty mile chase until he had crashed his car into a police barricade. *Id.* at 594. The Court recognized that a police action, placing the barricade, had stopped the suspect, but it held that there had been no seizure because the police had not intended for the suspect to hit the barricade. *Id.* at 596–97. Here, Butkus did not have to physically restrain Wells to prevent him from leaving, but the jury could find from other circumstances that a reasonable person in Wells's situation would not have felt free to leave.

Additionally, the Seventh Circuit has stated "that when a person has no desire to leave for reasons unrelated to the police presence, the coercive effect of the encounter can be measured better by asking whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter." *Carlson*, 621 F.3d at 620 (internal quotation marks omitted). Wells may not have had any desire to leave the trauma unit immediately because he was receiving treatment for his injuries. The jury reasonably could have found, however, that a reasonable person in his situation would not have felt free to tell the police to leave or refuse to answer their questions, when two uniformed and armed officers maintained constant contact with him, and

9

numerous officers and detectives appeared on the scene to ask questions.

Defendants also cite an Illinois state court case for the proposition that "a custodial situation cannot be created by the mere giving of *Miranda* warnings" and contend that the fact that Deneen gave *Miranda* warnings to Wells does not mean that Deneen seized Wells. *People v. McDaniel*, 249 Ill. App. 3d 621, 633, 619 N.E.2d 214, 224 (1993). Even if that is so, the fact that Deneen provided *Miranda* warnings to Wells is merely one of many items of evidence that the jury could have used to reasonably conclude that a reasonable person in Wells's situation would not have felt free to leave.

Additionally, a reasonable jury could have determined that Wells was not released at 9:15 p.m. on April 27 as defendants contend but instead was not released until nearly 11 p.m. that night. A principal item of evidence supporting this determination is the fact that Chicago Fire Department records state that the ambulance that picked up Wells from the police station was not dispatched until 10:35 p.m. and did not leave the police station until 10:55 p.m. Pl. Ex. 2. Although defendants contend that 10:55 p.m. was only the time that Wells actually left the station and that he was free to leave much earlier, the jury could reasonably decline to credit the testimony that supported defendants' position.

Farrell testified that he received a call telling him to release Wells at 9:15 p.m. and that the only reason that Wells was not released shortly after that was that he was disoriented, moving slowly, and taking his clothes off. Def. Ex. H at 55–57. Farrell acknowledged, however, that Wells's arrest report stated that he was released at 10:15 p.m. *Id.* at 66. He explained this fact by stating that Wells was free to leave earlier but that he had not gotten around to completing the paperwork because he was focused on

10

figuring out where Wells would go when he was released. *Id.* at 66–67. A reasonable jury, however, could have discredited Farrell's testimony. Farrell was a defendant himself, and although the jury did not find him liable on any claim, it reasonably could have discounted his testimony as self-interested. In addition, McMahon testified that her squad was not notified that Wells should be released until 10:15 p.m. and only then called to the police station to tell them to release Wells. Def. Ex. G at 14–15. The jury could reasonably have chosen to believe her version of events instead of Farrell's.

Furthermore, Farrell and Gutierrez testified that Wells did not actually leave his cell until Gutierrez and Deneen arrived at the station some time after Farrell had his conversations with Wells telling him that he was released. Def. Ex. B at 49–50; Def. Ex. H at 93. A reasonable jury could conclude that when Wells was still in his cell he was still in custody, even if Farrell may have told him that he was going to be released. When Farrell and the investigators removed Wells from his cell he was unsteady, so Farrell called an ambulance. Def. Ex. H at 93–94. Given that Fire Department records show that the ambulance was dispatched at 10:35 p.m., a reasonable jury could conclude that Wells was in his cell and still in custody a few minutes earlier. Finally, both before and after releasing Wells from his cell, Farrell stated that he was focused on getting Wells involuntarily admitted to a hospital for a mental examination. *Id.* at 92–94. Again, a reasonable jury could conclude that when the police are attempting to send someone in a police wagon or an ambulance to the hospital to be involuntarily admitted, that person was shown by a preponderance of the evidence to be in custody.

In sum, the Court concludes that a reasonable jury could have found that Wells was in custody for more than forty-eight hours and as much as fifty-three hours.

Defendants do not argue that there were extraordinary circumstances justifying detention for longer than forty-eight hours without a judicial probable cause determination.  Accordingly, a reasonable jury could have found that Wells's Fourth Amendment rights were violated.

### b.      Unreasonable detention of less than forty-eight hours

The Court next addresses whether a reasonable jury could have found that Wells was held for less than forty-eight hours for an improper purpose.  The Court does so to ensure a complete record in the event of an appeal and because the appropriate basis for a judgment against the defendants is relevant to the damages issues the Court addresses later in this decision.  Plaintiff argues that the jury was entitled to find that defendants unlawfully detained Wells, because they never had probable cause to arrest him for anything beyond a traffic violation, or because any probable cause to arrest Wells for a more serious crime that may have existed dissipated long before the police finally released him.

First, plaintiff contends that Wells's entire detention was unlawful, because the defendants never had probable cause to arrest for anything but a traffic violation. Plaintiff's argument is based primarily on a single eyewitness, Darryl Holbert, who stated that he saw Wells slumped over the wheel at the time of the accident and told an unnamed police sergeant this.  Pl. Ex. 3 at 4–7.  Plaintiff contends that because of what this witness said, none of the police officers could have had probable cause to detain Wells for any crime that had an intent element, such as the felony charges that the police were investigating while Wells was in custody.

Probable cause, however, does not require the police "to act as a judge or jury to

12

determine whether a person's conduct satisfies all of the essential elements of a particular statute. Rather, probable cause involves the exercise of judgment." *Stokes v. Bd. of Educ.*, 599 F.3d 617, 622–23 (7th Cir. 2010) (citation omitted). In addition, one of the defendants, Musial, testified that he had learned from another witness that the truck was traveling at fifty miles per hour just before the crash. Def. Ex. F at 74. He also stated that he inspected the scene for skid and yaw marks, which would have indicated that Wells had tried to stop, but found none. *Id.* at 76–77. Deneen likewise testified that he had learned from witnesses that Wells was speeding and ran a red light just prior to the accident. Def. Ex. E at 26. Musial testified that he discounted a medical explanation of the crash, stating that if Wells had been unconscious at the time, he would not have been able to navigate the curving highway exit ramp onto Cermak Road or avoid, as he did, the large concrete pillars on either side of the train station. Def. Ex. F at 118–19. The police were not obliged to resolve inconsistencies in witness reports in order to have probable cause. *Spiegel v. Cortese*, 196 F.3d 717, 724 (7th Cir. 1999). Plaintiff also contends that several of the defendants testified that they did not consider Wells's mental state, but their subjective motivations do not invalidate probable cause. *Carmichael v. Vill. of Palatine*, 605 F.3d 451, 457 (7th Cir. 2010).

In sum, neither the police officers' failure to consider Wells mental state nor the testimony of a single eyewitness provides a basis for a reasonable jury to find that the defendants lacked probable cause to arrest Wells for a crime with an intent element such as aggravated reckless driving. Furthermore, plaintiff concedes that defendants had probable cause to believe that Wells had committed the traffic violation of negligent driving. Plaintiff also concedes that defendants could arrest Wells for negligent driving,

13

even though it is a violation that is punishable only by a fine.  *See Virginia v. Moore*, 553 U.S. 164, 175–76 (2008) (Fourth Amendment does not forbid arrest for minor crimes, even when state law does not permit arrest).  Accordingly, no reasonable jury could find that defendants lacked probable cause to arrest Wells.

 Plaintiff next contends that even if defendants only had probable cause to arrest Wells for a traffic offense like negligent driving, the reasonable length of detention was no more than a few hours.  Plaintiff bases this argument on *Portis v. City of Chicago*, 613 F.3d 702 (7th Cir. 2010), in which the court noted that a detention of as little as four hours could be unreasonably long for a crime that was punishable only by fine.  *Id.* at 703, 705.  The court stated that the proper inquiry was to compare the reasons for detention to its length.  *Id.* at 705.  As an initial matter, *Portis* is distinguishable because there the court dealt with a situation in which police were only holding arrestees until they completed processing and so the forty-eight-hour time limit did not apply.  *See id.* at 704; *Chortek v. City of Milwaukee*, 356 F.3d 740, 746–47 (7th Cir. 2004).

 More importantly, the instructions that the Court gave the jury said that defendants could not delay Wells's release for an improper purpose, which the instructions said existed only if (1) there was no probable cause to arrest Wells in the first place or (2) probable cause dissipated.  Jury Instructions at 17 (docket no. 344). The instructions also listed four Illinois offenses that could form the basis for probable cause:  aggravated reckless driving, reckless homicide, aggravated driving under the influence, and negligent driving.  *Id.* at 19.  The jury was not instructed that Wells's detention could have been for an improper purpose if his release was simply delayed too long relative to the severity of the crime that permitted arrest, and plaintiff did not

14

argue otherwise. *See* Plaintiff's Submitted Jury Instructions at 4 (docket no. 399). The Court cannot sustain the verdict on a theory that was not presented to, and thus not considered by, the jury. *Liu v. Price Waterhouse LLP*, 302 F.3d 749, 756 (7th Cir. 2002) (once jury instructions are settled, "the parties can only argue that the jury did not properly apply the instructions to the facts").

Finally, plaintiff contends that any probable cause defendants had to arrest Wells quickly dissipated because they learned that he did not have drugs or alcohol in his system. Plaintiff also notes that police learned that Wells had a valid license and adequate sleep and did not have a bad driving record or a criminal history. Plaintiff does not contend, however, that any of these factors would have caused probable cause to dissipate on the negligent driving charge.

### c.    Liability of individual defendants

Defendants contend that none of the individual defendants whom the jury found liable were responsible for Wells's detention because they did not initiate the detention and were not responsible for holding Wells. "An individual cannot be held liable in a § 1983 action unless he caused or participated in the alleged constitutional deprivation." *Starzenski v. City of Elkhart*, 87 F.3d 872, 879 (7th Cir. 1996) (emphasis, brackets, and internal quotation marks omitted); *accord Alejo v. Heller*, 328 F.3d 930, 936 (7th Cir. 2003).

A reasonable jury could have found that each of the individual defendants who was found liable in fact participated in unlawfully holding Wells in violation of his Fourth Amendment rights. Deneen testified that he was one of several officers who agreed to place hold papers on Wells, papers that informed the watch commanders, like Farrell,

15

and employees at the police lockup not to release Wells because of an ongoing investigation. Def. Ex. D at 20–22. Deneen testified that he, McMahon, Gutierrez, and Musial were responsible for holding Wells. Def. Ex. E at 7–8. Gutierrez testified that he was the lead investigator and worked with Deneen and Musial but that McMahon was his lieutenant. Def. Ex. B at 16–17, 28–29. Gutierrez stated that he received instructions from McMahon and kept her informed of the progress of the investigation. *Id.* at 16–17. Musial testified that he completed the hold papers, and Farrell's testimony implied that Deneen or Musial gave the hold papers to him. Def. Ex. F at 52; Def. Ex. H at 75–76. McMahon testified that she was in charge of the Major Accident Investigation Squad and the investigation into Wells's accident. Def. Ex. G at 3–4. She stated that the hold papers on Wells had been placed by her squad with her approval. *Id.* at 13. Farrell also testified that he told Wells that he was going to be released only after receiving a call from the Major Accident Squad telling him that Wells was not going to be charged with a felony at that time. Def. Ex. H at 55–56.

### 2. Qualified immunity

The individual defendants contend that even if they violated Wells's Fourth Amendment rights, they are entitled to qualified immunity.

> Qualified immunity shields government actors from liability for civil damages where their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have been aware. When making a qualified immunity determination, a court considers (1) whether the [evidence] show[s] that the defendant violated a constitutional right, and (2) whether that right was clearly established at the time of the defendant's conduct.

*Hernandez v. Foster*, 657 F.3d 463, 473 (7th Cir. 2011) (citations and internal quotation marks omitted). "A right is clearly established when, at the time of the challenged

16

conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Id.* at 473–44 (brackets and internal quotation marks omitted). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Anderson v. Creighton*, 438 U.S. 635, 640 (1987) (citation omitted).

Defendants concede that a reasonable officer would have known of the requirement to provide a person in custody with a judicial probable cause determination within forty-eight hours under ordinary circumstances, a requirement established by the Supreme Court in 1991. *See County of Riverside*, 500 U.S. at 47. They contend, however, that a reasonable police officer would not have known that Wells could be considered to be in custody before he was formally arrested by Musial at 10:20 p.m. on April 25 and after Farrell claims to have released him around 9:15 p.m. on April 27. But the Supreme Court also stated in 1991 that "[a] person has been seized within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Hodari D.*, 499 U.S. at 627–28; *see also Kaupp v. Texas*, 538 U.S. 626, 629–30 (2003) (stating that seizure occurs when reasonable person would not feel that he was free to ignore police presence and listing circumstances that may affect seizure determination).

In light of this clearly established law, no reasonable police officer could believe that the only thing that mattered for determining when Wells was in custody was when Musial formally arrested him and when Farrell told him that he was going to be released. As discussed above, the jury could have found that a reasonable person in

17

Wells's situation would not have felt free to leave before he was formally arrested, because (among other things) two uniformed police officers shadowed him at the hospital and numerous officers and detectives questioned him even as he received medical treatment for his injuries. Similarly, the jury could have determined that Wells was not free to leave the police station when he remained locked in his cell until after 10 p.m. and did not actually leave until around 10:56 p.m. Given established Supreme Court case law, reasonable officers would have known that these factors affected the determination of when Wells was in custody.

In sum, the Court concludes that the jury reasonably could have determined that Wells was detained in violation of his Fourth Amendments rights. The Court also holds that those rights and the standard for determining custody were clearly established, so that the individual defendants are not entitled to qualified immunity. Accordingly, the Court declines to grant judgment as a matter of law on this claim.

### 3. Policy claim

The City contends that there was insufficient evidence for the jury to find that it had a policy of unlawfully detaining people for impermissible purposes.

> A local governing body may be liable for monetary damages under § 1983 if the unconstitutional act complained of is caused by: (1) an official policy adopted and promulgated by its officers; (2) a governmental practice or custom that, although not officially authorized, is widespread and well settled; or (3) an official with final policy-making authority. To demonstrate that the [City] is liable for a harmful custom or practice, the plaintiff must show that [City] policymakers were deliberately indifferent as to the known or obvious consequences. In other words, they must have been aware of the risk created by the custom or practice and must have failed to take appropriate steps to protect the plaintiff.

*Thomas*, 604 F.3d at 303 (citations and internal quotation marks omitted). "When a

plaintiff chooses to challenge a municipality's unconstitutional policy by establishing a widespread practice, proof of isolated acts of misconduct will not suffice; a series of violations must be presented to lay the premise of deliberate indifference." *Palmer v. Marion Cnty.*, 327 F.3d 588, 596 (7th Cir. 2003). Even multiple occurrences are not sufficient unless plaintiff "weave[s] these separate incidents together into a cognizable policy." *Phelan v. Cook Cnty.*, 463 F.3d 773, 790 (7th Cir. 2006).

Plaintiff contends that the City had a widespread practice or custom of unlawfully detaining person for improper purposes. The only evidence at trial that plaintiff cites to support this contention, however, is statements by several of the defendants that they treated Wells the same way they treated other arrestees. Gutierrez stated that he "would have done the same for anybody that's involved in an investigation." Def. Ex. B at 22. Musial was asked "[y]ou didn't treat [Wells] any different than any other arrestee, true?" Def. Ex. F at 66. He responded that he did not. Finally, plaintiff's counsel asked McMahon the following questions:

> Q: You in your department, your division, treated Mr. Wells like any other arrestee, correct?
> A: Correct.
> Q: Mr. Wells was not treated any better or any worse than any other arrestee. Is that a fair statement?
> A: That's a fair statement.

Def. Ex. G at 19–20. Plaintiff also argues that every officer who testified was asked if he or she treated Wells differently than other arrestees and that they all answered that they had not. Plaintiff does not provide any citations to transcripts of the trial to support this assertion. The Court nonetheless assumes, however, that plaintiff has recounted this testimony accurately.

Prior to trial, the Court granted summary judgment in the City's favor on plaintiff's claim that the City had a policy of holding arrestees for more than forty-eight hours before presenting them in court. This limited plaintiff's claim against the City to her contention that it had a practice of unreasonably delaying for an improper purpose the release or judicial presentment of arrested persons within forty-eight hours of arrest. The jury was instructed accordingly. Jury Instructions at 21 (docket no. 344). As discussed above, the Court has concluded that no reasonable jury could find that Wells was unreasonably detained even if he was held for less than forty-eight hours. Accordingly, the claim that the City had an unconstitutional policy of holding arrestees less than forty-eight hours fails, because any such policy did not cause a violation of Wells's rights. *See Houskins v. Sheahan*, 549 F.3d 480, 493–94 (7th Cir. 2008).

This aside, the evidence was insufficient to sustain plaintiff's policy claim. Plaintiff argues that the fact that several defendants stated that they treated Wells the same as other arrestees amounts to evidence that other arrestees were likewise subjected to improperly prolonged detention and thus that the City had a practice of unlawfully detaining arrestees. Plaintiff concedes, however, that she must establish a series of violations to demonstrate deliberate indifference. *Palmer*, 327 F.3d at 596. The handful of statements plaintiff cites are not evidence from which a reasonable jury could find that there had been a series of unlawful detentions. The cited questions and answers were broadly worded. Nothing about them or their context indicates whether the testimony referred to the investigation as a whole, the unlawful detention claim specifically, the arrest of Wells with or without probable cause, or the alleged denial of medical care. And none of the statements indicate that the defendants who were

20

testifying had dealt with or were referring to factually similar situations.  In sum, the fact that these defendants stated they treated Wells the same as other arrestees did not permit a reasonable jury to find that "the same problem has arisen many times and the municipality has acquiesced in the outcome."  *Valentino v. Vill. of S. Chicago Heights*, 575 F.3d 664, 675 (7th Cir. 2009) (internal quotation marks omitted).

Accordingly, the Court grants judgment as a matter of law in favor of the City on this claim.

**B.     New trial**

The individual defendants contend that the Court should order a remittitur or a new trial because the compensatory and punitive damages awarded on plaintiff's claim that they unlawfully detained Wells are excessive.

**1.     Compensatory damages**

The jury awarded plaintiff compensatory damages of $1 million for Wells's pain and suffering.  "In reviewing an award of compensatory damages, [courts] are guided by three inquiries: (1) whether the award is monstrously excessive; (2) whether there is no rational connection between the award and the evidence; and (3) whether the award is roughly comparable to awards made in other cases."  *David v. Caterpillar, Inc.*, 324 F.3d 851, 864 (7th Cir. 2003).  Defendants contend that the damages awarded by the jury are unmoored from the evidence in the case and are excessive, particularly when compared to other cases.  Plaintiff argues that "the significant humiliation, degradation, and physical, mental, and emotional suffering Defendants caused Mr. Wells from the moment he was taken into police custody up through the moment he was carried out from police custody" justify the jury's damage award.

21

There was ample evidence for the jury to find that Wells suffered significant physical pain during the time he was detained, as well as intense humiliation and severe mental and emotional distress. Plaintiff presented a video of Wells confined in a small interrogation room early in the morning of April 26, showing him staggering, lying on the floor and groaning, and urinating in the corner. Pl. Tr. Ex. 58. Musial testified that he saw Wells resting his head on the wall because the room was so small and sleeping on the floor because the only bench in the room was not big enough to accommodate him. Pl. Ex. F at 101, 104–05. A police procedures expert testified that during this time Wells had been denied food and bathroom access. Pl. Ex. 5 at 26–27. The man confined in the holding cell next to Wells later that morning stated that he heard Wells moaning and groaning as he tried to sleep; he stated that Wells sounded like he was uncomfortable and in pain. Def. Ex. A at 7–8, 10. Farrell testified that on the night of April 26, Wells was wearing nothing but his underwear until Farrell told him to put on more clothes. Def. Ex. H at 29–30.

Other testimony showed Wells's severe distress and pain on the night that he was to be released. Farrell informed Wells that he might be released soon but then returned a few minutes later to find that Wells had taken off all his clothes. *Id.* at 54–57. Farrell told Wells to put his clothes back on but testified that Wells was moving very slowly and that he became concerned about Wells's health. *Id.* at 58–59. Farrell walked away for a few minutes more and came back to find that Wells had again taken off his clothes. *Id.* at 60–61. Farrell also noticed that Wells had been urinating on the floor and that he had been defecating in his underwear. *Id.* at 91. Deneen testified that when he arrived at the station, Wells was not fully dressed, appeared sore and

22

confused, and was not responsive to questions. Def. Ex. D at 16–17. Gutierrez also testified that Wells was naked and said that he appeared groggy and off balance. Def. Ex. B at 50–51. Farrell testified that when Wells finally left his cell, he was so unsteady that Farrell felt obliged to grab his arm and call for an ambulance to take him to the hospital. Def. Ex. H at 93–94.

This evidence supports a substantial damage award for Wells's pain and suffering. A consideration of all the evidence, however, suggests that $1 million for his pain and suffering is excessive. Wells was in custody for, at most, fifty-three hours. And as previously stated, the jury reasonably could determine only that the final five hours of his detention were unlawful, because no reasonable jury could conclude that defendants unreasonably detained Wells for a period under forty-eight hours. As such, the Court must consider whether the jury's award was grossly excessive compensation for Wells's pain and suffering during a five-hour period of unlawful detention.

Plaintiff cites an Illinois Supreme Court case for the proposition that it is inappropriate to calculate pain on a per hour or per day basis. *Caley v. Manicke*, 24 Ill. 2d 390, 392–94, 182 N.E.2d 206, 208–09 (1962). This is not what the Court is doing. In any event, *Caley* is distinguishable and is not binding in federal court. There, the court held that an attorney could not present a daily figure for pain and suffering to a jury and ask them to multiply that figure by the number of days the plaintiff had experienced the pain. *Id.* at 391, 182 N.E.2d at 207. Though the court held that this was an improper argument for counsel to make to the jury, it said nothing about the methods by which a court should review a jury's award of damages. Further, in a recent case, the Seventh Circuit expressly noted the per-minute amount of damages implied

by a jury award, suggesting that this might be one appropriate lens through which to assess a jury's award of damages. *See Fox v. Hayes*, 600 F.3d 819, 836 (7th Cir. 2010).

As indicated above, the Seventh Circuit has directed courts to consider whether a particular award of damages is roughly comparable to those in other cases. That does not mean, however, that damage awards by juries must or may be reduced to some sort of lowest common denominator. And as this Court has previously noted, this sort of comparative analysis must take account of the fact that our Constitution confers the determination of civil disputes upon lay juries, not judges:

> [O]ur system has not chosen an adjudicatory model that sets, *de facto*, a schedule of compensation to be awarded for particular types of injuries. If we are to remain faithful to the Founders' vision, which includes submitting civil disputes to citizen juries, and if damages for physical and emotional pain and suffering are to be available, we must be willing to accept variations in how juries will assess those damages in different cases.

*Deloughery v. City of Chicago*, No. 02 C 2722, 2004 WL 1125897, at *5 (N.D. Ill. May 20, 2004).

Caution in making a comparative analysis of damage awards is warranted for other reasons as well. First, no evidence of supposedly comparable cases was presented to the jury at trial, and "there is something rather incongruous about the motion that a court should overturn a jury's verdict as excessive by comparison with other cases th[e] jury was not allowed to assess." *Id.* at *4. Second, the awards in reported cases are a small sample of all awards; the reported decisions may not describe the underlying facts sufficiently to permit comparison across cases; and comparisons with other cases ignore the inherently individual and subjective nature of

damages in general and of pain and suffering damages in particular. *See id.* at *5. Still, the results in other cases illustrate the thinking of some courts and juries regarding appropriate damages and provide some guidance for determining whether a particular award is grossly excessive or grossly deficient.

With these factors in mind, the Court considers several cases cited by the parties and others found through research. The Court examined federal district court and court of appeals decisions discussing pain and suffering damages awarded for periods of detention, and in particular decisions in cases in which the plaintiff suffered significant physical or emotional suffering. The cases referenced below are those in which the court most specifically addressed an amount of damages awarded for plaintiffs' detention and provided facts sufficient to determine the length of time and assess any similarity to the current case.

In *Fox v. Hayes*, the Seventh Circuit determined that $1.7 million in damages for a thirty-six hour unlawful detention was excessive, and it reduced the damages to $16,000. *Fox*, 600 F.3d at 846. Unlike Wells, Fox did not suffer physical pain or distress while in custody. But he did suffer emotional distress. Police officers accused him of murdering his daughter, showed him photos of the crime scene, coerced him into confessing to the murder, lied to him about the results of a polygraph test, threatened him with prison rape, and touched him in "sexually threatening" ways. *Id.* at 830–31. Eventually, Fox confessed just to stop the interrogation. *Id.* at 831. Nevertheless, the Seventh Circuit felt that an appropriate amount of damages was just under $450 per hour of confinement.

In *Warfield v. City of Chicago*, 679 F. Supp. 2d 876 (N.D. Ill. 2010), a jury

awarded several plaintiffs compensatory damages for unlawful detention ranging from nominal damages to $40,000. *Id.* at 880–81. The summary judgment decision in that case indicates that plaintiffs, who were not suspected of any crime but were only witnesses, were searched and held in custody by police following an evening shooting until 8 a.m. the next day. *Warfield v. City of Chicago*, 565 F. Supp. 2d 948, 953–58 (N.D. Ill. 2008). Two of the plaintiffs who received the larger awards were a mother and her eight-year-old son who claimed they were locked in a room so long that they had to bang on the door so that they could get out to use the bathroom. *Id.* at 956. The plaintiff who received the largest award was a fourteen-year-old girl who was without her parents all night. *Id.* at 953; *see also McCloud v. Fortune*, 510 F. Supp. 2d 649, 652–57, 600 (N.D. Fla. 2007) (mother and two teenagers awarded $238,000 when detained for 3.5 hours and subject to intrusive searches, including a strip search on the side of the road, and abusive language). The largest jury award in *Warfield*, which the defendants in that case did not challenge, amounted to perhaps $4,000 per hour of detention. *See also Burke v. McDonald*, 572 F.3d 51, 53–55 (1st Cir. 2009) (jury awarded $400,000 compensatory damages when plaintiff was held forty-two days on charges of committing a well-publicized murder); *Marion v. LaFargue*, 186 F. App'x 96, 96 (2d Cir. 2007) (unpublished) (magistrate judge did not abuse discretion in remitting $1 million award to $180,000 when plaintiff had been involuntarily confined to a mental hospital for six days and forcibly medicated; in second trial on damages, jury awarded $115,000); *Grauer v. Donovan*, No. 92 C 3186, 1996 WL 82462, at *6 (N.D. Ill. Feb. 23, 1996) (remitting jury award to $25,000 compensatory damages ($37,644 in 2012

dollars)[1] when plaintiff was detained for four hours for DUI and claimed embarrassment and damage to his professional standing).

None of the cases the Court has just discussed, however, involved any physical pain or suffering. Nor did *Swanigan v. City of Chicago*, No. 08 C 4780, 2012 WL 28696 (N.D. Ill. 2012), which the defendants cite as a comparable case. There, police held Swanigan for fifty-one and one-half hours while waiting for the state's attorney to approve robbery charges. *Id.* at *2. A jury awarded him $60,000 compensatory damages for the unlawful detention. *Id.* Though Swanigan found the conditions "uncomfortable," there is no indication that he was injured or in physical pain. *Id.*

Other cases the Court has found involving relatively short periods of time combined with physical pain have involved damage awards considerably smaller than the damages awarded to plaintiff here. This is true even though some of the cases involved plaintiffs who were in physical pain because of injuries caused by the police. In *Arnold v. Wilder*, 657 F.3d 353 (6th Cir. 2011), a police officer placed plaintiff in a choke hold, sprayed her with pepper spray, kept her besieged in her house, and finally arrested her. *Id.* at 357–60. The entire ordeal took about six hours, and plaintiff's injuries were serious enough to require a trip to the hospital. *Id.* at 361–62. A jury awarded $2,400 for plaintiff's physical injuries and $50,000 for mental pain and suffering. *Id.* at 362. Even though the case involved excessive force as well as false arrest and unlawful detention, the jury awarded plaintiff the equivalent of $8,700 per

---

[1] The Court calculates the inflation-adjusted amount of the award by using the inflation calculator provided at the Bureau of Labor Statistics website. CPI Inflation Calculator, http://www.bls.gov/data/inflation_calculator.htm (last visited Aug. 13, 2012).

hour of the time she was under attack and then in custody.

Similarly, *Sabir v. Jowett*, 214 F. Supp. 2d 226 (D. Conn. 2002), involved police injuring plaintiff in a scuffle, using pepper spray on him, and carrying him around by his neck. *Id.* at 234–35. They had to take plaintiff to the hospital to receive a brace for his ankle that they had injured. *Id.* at 235. Because plaintiff's pants would not fit over his brace, police then confined plaintiff overnight in the police barracks without pants even though temperatures outside were between ten and twenty degrees. *Id.* A jury awarded plaintiff compensatory damages of $75,000. *Id.* at 234. Plaintiff suffered considerable discomfort from his injuries and inadequate clothing, but the jury's compensatory damage award amounted to less than $5,000 per hour of confinement.

In *King v. City of New York*, No. 92 Civ. 7738 JGK, 1996 WL 737195 (S.D.N.Y. Dec. 24, 1996), police beat plaintiff, kicking him and hitting him with a radio and nightstick. *Id.* at *1–2. The police then detained plaintiff for thirty hours, during which he was in pain and received only a single trip to the hospital for the treatment of his injuries. *Id.* at *2–3. Plaintiff also suffered emotional distress and feared for his safety while in jail. *Id.* at *3. A jury awarded plaintiff $300,000 in compensatory damages, but the court remitted the damages to $200,000, the equivalent of $292,515 in today's dollars, stating that the jury's award of $300,000 was "so excessive as to shock the judicial conscience." *Id.* at *5.

In *Sulkhowska v. City of New York*, 129 F. Supp. 2d 274 (S.D.N.Y. 2001), plaintiff received a relatively large award when viewed on an hourly basis. Plaintiff was arrested and held in custody for at least twelve hours after a dispute about licenses at her bar. *Id.* at 283–86. The defendant police officers "closed down the bar, vacating it of its

28

patrons and, as was 'standard procedure,' seizing its liquor stock." *Id.* at 284. Plaintiff

was then handcuffed to the bars of a holding cell and denied water and her asthma

medication until she eventually had to be taken to the hospital. *Id.* at 285. After a

bench trial, the court awarded plaintiff $275,000 in compensatory damages. *Id.* at 309.

The court also stated, however, that plaintiff's suffering had continued over the two and

one-half years since the arrest and that she had suffered from debilitating post-

traumatic stress disorder as established by expert testimony. In the current case, by

contrast, plaintiff may recover damages only for Wells's suffering while wrongfully

detained.

Likewise, in *Ismail v. Cohen*, 899 F.2d 183 (2d Cir. 1990), the court upheld a

jury's compensatory damage award of $650,000 in a case in which a police officer beat

plaintiff and then detained him for approximately sixty hours. *Id.* at 184–85. Accounting

for inflation, the jury's award would be $1.2 million in today's dollars, larger than the

award to Wells, although still much less if considered on a per-hour basis. In that case,

the police had caused plaintiff's injuries, which included "two displaced vertebrae, a

cracked rib, and serious head trauma." *Id.* at 185. Plaintiff was also prosecuted based

on the incident in which he was injured, and he underwent a criminal trial before he was

acquitted of all charges. *Id.*

Given the basis upon which the Court has upheld the jury's determination of

liability on the unlawful detention claim, the Court concludes that defendants have

shown that the compensatory damage award that the jury made is grossly excessive

such that a remittitur is appropriate. That said, the damage award appropriately takes

into account the severe level of disorientation and mental distress, not to mention

29

physical pain, that Wells suffered during his custody – distress that appears to have increased toward the end of his custody, which was the period during which he was unlawfully held. It is therefore appropriate to view the compensable injury in this case as significantly more severe than those in various other cases the Court has discussed. The Court concludes that the highest reasonable amount the jury properly could award, *see Jabat, Inc. v. Smith*, 201 F.3d 852, 858 (7th Cir. 2000), was $250,000. The Court thus grants the individual defendants' motion to the extent it seeks a remittitur of the compensatory damage award. The Court will grant defendants' motion for a new trial on the issue of damages unless plaintiff accepts, within ten days of this order, a reduction of the compensatory damage award to $250,000.

### 2. Punitive damages

The individual defendants contend that the jury's punitive damage award was unsupported by the evidence and, alternatively, that the amounts the jury awarded plaintiff are excessive and violate the defendants' due process rights. "A jury may award punitive damages in a § 1983 case if it finds that the defendant's conduct was motivated by evil intent or callous indifference to the plaintiff's federally protected rights." *Marshall v. Teske*, 284 F.3d 765, 772 (7th Cir. 2002).

As discussed above, Wells's Fourth Amendment rights were clearly established, and the jury reasonably was entitled to find that the individual defendants participated in violating those rights. There is little to indicate, however, that the defendants acted with evil intent or callous indifference to Wells's rights. Gutierrez, Deneen, and Musial testified that they believed there was probable cause to hold Wells for the offenses for which he was arrested, and Deneen and McMahon testified that they did not believe the

police held Wells for an improper purpose.  Def. Ex. B at 55; Def. Ex. E at 25–26; Def.
Ex. F at 91; Def. Ex. G at 32.  Gutierrez, Deneen, and McMahon acknowledged that
they could generally only hold an arrestee for forty-eight hours.  Def. Ex. B at 18–19;
Def. Ex. D at 19–20; Def. Ex. G at 15–16, 32.  Musial and McMahon denied holding
Wells for more than forty-eight hours.  Def. Ex. F at 120; Def. Ex. G at 32.  All of the
defendants stated that they were holding Wells so they could investigate further and
receive approval for charges from the state's attorney.  Def. Ex. B at 19, 46; Def. Ex. D
at 21; Def. Ex. F at 20–21, 92; Def. Ex. G at 13–14, 34.  The jury appropriately could
find that the officers were mistaken and did violate Wells's rights.  Based on the
evidence, however, the jury could not reasonably find that they acted out of malice or
that their violation of Wells' rights stemmed from callous disregard of those rights.

In the Court's view, the situation here is similar to that in *Kyle v. Patterson*, 196
F.3d 695 (7th Cir. 1999), a case in which the Seventh Circuit decided as a matter of law
that punitive damages were inappropriate on the plaintiff's unlawful detention claim.
*Id.* at 698.  In that case, police held Kyle for sixty-one hours while waiting for the state's
attorney to approve murder charges against him.  *Id.* at 696–67.  The district court
granted Kyle summary judgment on liability but held that Kyle was not entitled to
compensatory damages (because he later pled guilty to the charge) or punitive
damages.  *Id.* at 697.  Kyle challenged the punitive damage determination on appeal.
The Seventh Circuit affirmed, stating that there was "not a scintilla of evidence
suggesting evil motive on the part of the police defendants to deprive Kyle of his
constitutional rights."  *Id.*  This case is similar, because although the jury could
reasonably find that defendants violated Wells's Fourth Amendment rights for keeping

31

him in custody beyond forty-eight hours, the evidence is not indicating of evil motive or callous disregard.

Plaintiff contends that the punitive damages are appropriate because none of the defendants ever considered Wells's mental state when determining if there was probable cause, especially in light of the testimony of Holbert that Wells was slumped over the wheel of his truck before the accident. Even if this knowledge appropriately could be imputed to other officers for liability purposes, for purposes of punitive damages what counts is the particular defendant's state of mind. The individual defendants all testified that they did not speak to Holbert and were unaware of what he had claimed to see, Def. Ex. B at 54–55; Def. Ex. E at 31–32; Def. Ex. F at 117; Def. Ex. G at 25, 37, and plaintiff offered no contrary evidence. Additionally, all of the defendants acknowledged that probable cause could dissipate, and Gutierrez and Musial explained why they did not believe probable cause had dissipated when test results on April 27 showed that Wells had no drugs or alcohol in his system after the accident. Def. Ex. B at 20, 48–49; Def. Ex. D at 20; Def. Ex. F at 118, 132–33; Def. Ex. G at 16. In sum, there was no evidence from which the jury could conclude that the individual defendants ignored Wells's mental state and violated his rights because of evil intent or callous disregard for those rights.

Plaintiff also claims that another judge in this district upheld compensatory and punitive damages related to an unlawful detention claim in *Warfield v. City of Chicago*. Although the court in that case denied defendants' motions for a new trial and judgment as a matter of law, it does not appear that there was any particularized challenge to the punitive damage award. *Warfield*, 679 F. Supp. 2d at 881, 890–91, 893. Further, the

summary judgment decision in *Warfield* indicates that the case is distinguishable. *Warfield* involved several witnesses to a police shooting who were held and interrogated over night, so there were no issues related to whether officers thought they had probable cause or understood and attempted to follow the forty-eight hour rule as it pertains to suspects. *Warfield*, 565 F. Supp. 2d at 953–58, 965–67.

For these reasons, the Court determines that the evidence, even considered in the light most favorable to plaintiff, does not support an award of punitive damages.

### Conclusion

For the reasons stated above, the Court grants defendants' post-trial motion in part and denies it in part [docket no. 383]. Specifically, the Court grants judgment as a matter of law with respect to the claim against Chicago and vacates the punitive damage awards against defendants Deneen, Gutierrez, McMahon, and Musial. In addition, unless plaintiff advises the Court on or before September 27, 2012 that she accepts a reduction of the compensatory damage award to $250,000, the Court will grant the individual defendants' motion for a new trial to the extent they seek a new trial on the issue of compensatory damages. The Court otherwise denies defendants' motion. The case is set for a status hearing on October 1, 2012 at 9:30 a.m.

s/ Matthew F. Kennelly
MATTHEW F. KENNELLY
United States District Judge

Date:  September 16, 2012